

FILED

**June 2, 2015**

Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-13-00723-CR
5240161
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/11/2015 9:18:06 PM
JEFFREY D. KYLE
CLERK

## No. 03-13-0723-CR

IN THE COURT OF APPEALS
THIRD DISTRICT
AUSTIN, TEXAS

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

5/11/2015 9:18:06 PM

~~JEFFREY D. KYLE~~
Clerk

**CHARLES ANTHONY MALOUFF, JR., APPELLANT**

**VS.**

**THE STATE OF TEXAS, APPELLEE**

APPEAL FROM THE 299TH DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBER D-1-DC-13-904021
THE HONORABLE JUDGE KAREN SAGE, PRESIDING

## STATE'S BRIEF AND CROSS-POINT

ROSEMARY LEHMBERG
DISTRICT ATTORNEY
TRAVIS COUNTY, TEXAS

M. SCOTT TALIAFERRO
TEXAS BAR NO. 00785584
ASSISTANT DISTRICT ATTORNEY
DIRECTOR, APPELLATE DIVISION
DISTRICT ATTORNEY'S OFFICE
P.O. BOX 1748
AUSTIN, TEXAS 78767
PHONE: 512.854.3626 FAX: 512.854.4810
EMAIL: scott.taliaferro@traviscountytx.gov
AND AppellateTCDA@traviscountytx.gov

**THE STATE CONDITIONALLY REQUESTS ORAL ARGUMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................i

INDEX OF AUTHORITIES.......................................................................................... iii

STATEMENT OF THE CASE ......................................................................................1

STATEMENT REGARDING ORAL ARGUMENT....................................................2

STATEMENT OF FACTS ............................................................................................3

SUMMARY OF THE ARGUMENTS ..........................................................................7

THE STATE'S REPLY TO THE FIRST POINT OF ERROR...................................9

THE TRIAL COURT SHOULD REJECT THE APPELLANT'S CLAIM THAT THE TRIAL
COURT ERRED WHEN IT DENIED HIS MOTION TO QUASH THE INDICTMENT ON
GROUNDS OF SELECTIVE PROSECUTION. ...................................................................9

THE STATE'S REPLY TO THE SECOND POINT OF ERROR ..........................23

THIS COURT SHOULD REJECT THE APPELLANT'S CLAIMS RELATING TO THE
SPOLIATION OF EVIDENCE...................................................................................23

THE STATE'S REPLY TO THE THIRD POINT OF ERROR ..............................43

THIS COURT SHOULD REJECT THE APPELLANT'S CLAIM THAT TRIAL COURT ERRED
BY DENYING ONE OR MORE OF HIS REQUESTS FOR CONTINUANCE. ..........................43

THE STATE'S REPLY TO THE FOURTH POINT OF ERROR ..........................60

THE TRIAL COURT DID NOT ERR WHEN IT DENIED THE APPELLANT'S MOTION TO
QUASH THE INDICTMENT ON THE BASIS OF VAGUENESS. ........................................60

THE STATE'S CROSS-POINT OF ERROR..................................................69

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT SPREADSHEETS PREPARED BY THE STATE'S ANALYST WERE REQUIRED, UNDER BRADY AND ITS PROGENY, TO BE GIVEN TO DEFENSE COUNSEL.. ...............................................60

PRAYER ..................................................................................................78

CERTIFICATE OF COMPLIANCE .............................................................79

CERTIFICATE OF SERVICE .......................................................................79

# INDEX OF AUTHORITIES

**Cases**

*American Plant Food Corp. v. State*, 508 S.W.2d 598 (Tex. Crim. App. 1974).... 63

*Beck v. State*, 682 S.W.2d 550 (Tex. Crim. App. 1985) .......................................... 66

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978).......................................................... 15

*Boutwell v. State*, 719 S.W.2d 164 (Tex. Crim. App. 1986)................................... 17

*Bradley v. State*, 688 S.W.2d 847 (Tex. Crim. App. 1985) ..................................... 38

*Brady v. Maryland,* 373 U.S. 83 (1963) ............................................................passim

*Broxton v. State*, 909 S.W.2d 912 (Tex. Crim. App. 1995).............................. 31, 34

*Bynum v. State*, 767 S.W.2d 769 (Tex. Crim. App. 1989)....................................... 63

*California v. Trombetta*, 467 U.S. 479 (1984)..................................................passim

*Clark v. State*, 365 S.W.3d 333 (Tex. Crim. App. 2012).................................. 11, 29

*Clay v. State*, 361 S.W.3d 762 (Tex. App.—Fort Worth 2012, no pet.)................. 11

*Colyer v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014)................................ 18, 22

*Darty v. State*, 193 S.W.2d 195 (1946).................................................................... 57

*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010) .......................... 11, 25, 58

*Dewberry v. State*, 4 S.W.3d 735 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000) ............................................................................................................. 57

*Ex parte Dixon*, 964 S.W.2d 719 (Tex. App.—Fort Worth 1998) ......................... 71

*Ex parte Holbrook*, 609 S.W.2d 541 (Tex. Crim. App. 1980)................................ 61

*Ex parte Napper*, 322 S.W.3d 202 (Tex. Crim. App. 2010)....................... 26, 27, 29

*Ex parte Quintana*, 346 S.W.3d 681 (Tex. App.—El Paso 2009, pet. ref'd).......... 17

*Gawlik v. State*, 608 S.W.2d 671 (Tex. Crim. App. 1980) ................... 16, 19, 20, 21

*Givens v. State*, 749 S.W.2d 954 (Tex. App.—Fort Worth 1988, pet'n ref'd) ........ 71

*Green v. State*, 934 S.W.2d 92 (Tex. Crim. App. 1996)......................................... 16

*Haecker v. State*, 571 S.W.2d 920 (Tex. Crim. App. 1978) ............................. 62, 63

*Hampton v. State*, 86 S.W.3d 603 (Tex. Crim. App. 2002).................................... 70

*Hargrove v. State*, 774 S.W.2d 771 (Tex. App.—Corpus Christi 1989, pet. ref'd) 77

*Haygood v. State*, 127 S.W.3d 805 (Tex. App.—San Antonio 2003) .................... 70

*Heiselbetz v. State*, 906 S.W.2d 500 (Tex. Crim. App. 1995) ................................ 59

*Hernandez v. State*, 492 S.W.2d 466 (Tex. Crim. App. 1973) ............................... 57

*Hooper v. State*, No. 03-08-00125-CR, 2009 Tex. App. LEXIS 7880 (Tex. App.— Austin Oct. 9, 2009) (not designated for publication)........................................... 26

*Johnson v. State*, 43 S.W.3d 1 (Tex. Crim. App. 2001) ......................................... 18

*Jones v. McCaughtry*, 965 F.2d 473 (7th Cir. 1992) .............................................. 28

*Kellar v. State*, 108 S.W.3d 311 (Tex. Crim. App. 2003)....................................... 67

*Kissee v. State*, 733 S.W.2d 361 (Tex. App.—San Antonio 1987) ........................ 38

*Little v. State*, 991 S.W.2d 864 (Tex. Crim. App. 1999) ........................................ 72

*Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010) ..................... 11, 25, 58, 61

*Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004) ........................... 12

*Montemayor v. State*, 55 S.W.3d 78 (Tex. App.—Austin 2001) ............... 11, 25, 58

*Oyler v. Boles*, 368 U.S. 448 (1962) .................................................................. 16

*Pacheco v. State*, No. 01-05-00391-CR ; 2006 Tex. App. LEXIS 921 (Tex. App.— Houston [1st Dist.] Feb. 2, 2006) (not designated for publication).................... 12

*Palmer v. State*, 902 S.W.2d 561 (Tex. App.—Houston [1st  Dist.] 1995, no pet.) ................................................................................................................71

*Perry v. State*, No. 02-13-00054-CR, 2014 Tex. App. LEXIS 249 (Tex. App.—Fort Worth Jan. 9, 2014) (not designated for publication)........................................... 12

*Pfeiffer v. State*, 363 S.W.3d 594 (Tex. Crim. App. 2012).................................... 69

*Posey v. State*, 966 S.W.2d 57 (Tex. Crim. App. 1998) ....................................... 38

*Prince v. State*, 137 S.W.3d 886 (Tex. App.—Houston [1st Dist.] 2004)........ 12, 14

*Ricketts v. State*, 89 S.W.3d 312 (Tex. App.—Fort Worth 2003, pet. ref'd) .......... 57

*Roise v. State*, 7 S.W.3d 225, 243 (Tex. App.—Austin 1999) ............................... 15

*Salazar v. State*, 185 S.W.3d 90 (Tex. App.—San Antonio 2005)......................... 26

*Saveika v. State*, No. 03-11-00070-CR, 2012 Tex. App. LEXIS 4553 (Tex. App.— Austin June 8, 2012) (not designated for publication) ..................... 16, 17, 19, 21

*Seaton v. State*, No. 02-03-0487-CR, 2005 Tex. App. LEXIS 905 (Tex. App.—Fort Worth Feb. 3, 2005)........................................................................................58

*Shotwell v. State*, No. 10-12-00166-CR, 2013 Tex. App. LEXIS 8665 (Tex. App. – Waco July 11, 2013) (not designated for publication) ........................................ 31

*Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert. denied, 542 U.S. 905 (2004) ..............................................................................................30

*Smith v. State*, 309 S.W.3d 10 (Tex. Crim. App. 2010)........................................ 60

*State v. DeLeon*, 971 S.W.2d 701 (Tex. App.—Amarillo 1998)............................ 71

*State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007)............................. 17, 18

*State v. Holloway*, 886 S.W.2d 482 (Tex. App.—Houston  [1st Dist.] 1994)........ 38

*State v. Mays*, 967 S.W.2d 404 (Tex. Crim. App. 1998) ....................................... 61

*State v. Moff*, 154 S.W.3d 599 (Tex. Crim. App. 2004) .................................. 65, 67

*Tamminen v. State*, 653 S.W.2d 799 (Tex. Crim. App. 1983)........................... 31, 34

*Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) ....................... 43, 70, 71

*United States v. Bagley*, 473 U.S. 667 (1985) ................................... 44, 70, 71, 75

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926) ........................... 15

*United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996)................................... 28, 35

*United States v. McKinney*, 758 F.2d 1036 (5th Cir. 1985)................................... 71

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982)..................................... 26

*Webb v. State*, 232 S.W.3d 109 (Tex. Crim. App. 2007)....................................... 30

*Wilson v. State*, 7 S.W.3d 136 (Tex. Crim. App. 1999)............................................ 72
*Wood v. State*, 18 S.W.3d 642 (Tex. Crim. App. 2000) .............................. 11, 25, 30
*Woodall v. State*, 77 S.W.3d 388 (Tex. App.—Fort Worth 2002, pet. ref'd) ......... 58
*Yates v. State*, 941 S.W.2d 357 (Tex. App.—Waco 1997, pet'n ref'd) ................... 71

**Statutes**

Tex. Code Crim. Proc. art. 29.03 ............................................................................ 57
Tex. Code Crim. Proc. art. 39.14 ...................................................................... 50, 76
Tex. Penal Code § 31.01(1) .................................................................................... 64
Tex. Penal Code § 32.46 ............................................................................. 61, 63, 73

**Other Authorities**

George E. Dix and Robert O. Dawson, 42 TEXAS PRACTICE, 2nd ed., § 22.64
    (2001) ................................................................................................................ 28

**Rules**

Tex. R. App. P. 21.3.................................................................................................. 18
Tex. R. App. P. 33.1................................................................................................. passim
Tex. R. App. P. 38.1....................................................................................... 25, 30, 58
Tex. R. App. P. 44.2(a) ........................................................................................... 43

**Constitutional Provisions**

U.S. Constitution, Amend. V ................................................................................... 16

IN THE COURT OF APPEALS
THIRD DISTRICT
AUSTIN, TEXAS

---

CHARLES ANTHONY MALOUFF, JR., APPELLANT

vs.

THE STATE OF TEXAS, APPELLEE

---

APPEAL FROM THE 299TH DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBER D-1-DC-13-904021
THE HONORABLE JUDGE KAREN SAGE, PRESIDING

---

STATE'S BRIEF AND CROSS-POINT

---

TO THE HONORABLE COURT OF APPEALS:

The State of Texas, by and through the District Attorney for Travis County, respectfully submits this brief in response to that of the appellant, Charles Malouff.

## STATEMENT OF THE CASE

The appellant was charged by indictment with committing the offenses of Securing Execution of a Document by Deception (Count I) and Misapplication of

Fiduciary Property (Count II). 2 CR 61.[1] On February 25, 2013, the appellant was re-indicted for the same offenses. 1 CR 6. On April 13, 2013, the appellant filed a motion to quash the indictment. CR 14–18. That motion was denied. 4 RR 19–20. On July 31, 2013, the State abandoned Count II. 5 RR 5-6.

On August 7, 2013, a jury was sworn, and a trial on the merits commenced. 7 RR 54. On August 28, 2013, the jury returned its verdict, finding the appellant guilty of the offense of Securing Execution of a Document by Deception. 20 RR 9. On September 24, 2013, the trial court assessed the appellant's punishment at imprisonment for a term of 15 years. 21 RR 27.

On October 24, 2013, the appellant filed a motion for new trial. 1 CR 320. On that same date, he gave notice of appeal. 1 CR 327. On November 12, 2013, the trial court held a hearing on that motion, and the trial court denied the motion for new trial in its entirety. 22 RR 4, 9. The trial court certified that the appellant has the right to appeal. CR 288.

## STATEMENT REGARDING ORAL ARGUMENT

The State believes that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs filed by the parties.

---

[1]  NOTE CONCERNING REFERENCES TO THE APPELLATE RECORD:
A citation in the form of "*x* CR *y*" refers to page *y* of volume *x* of the Clerk's Record.
A citation in the form of "*x* RR *y*" refers to page *y* of volume *x* of the Reporter's Record.

However, if the Court grants the Appellant's request for oral argument, the State respectfully requests that the State also be permitted to provide oral argument.

## STATEMENT OF FACTS

The appellant ran a company known as CM Alternative Energies. 7 RR 129, 9 RR 99. The City of Jonestown applied to the Texas Comptroller's office for a grant to fund the installation of several wind turbines in and around Jonestown. *See* State's Exh. 1. The appellant, whose company was slated to provide those turbines, actually drafted the grant application. 7 RR 146; 9 RR 13. In exchange for his grant-writing services, the City of Jonestown provided the appellant with office space near the City's other offices. 7 RR 139-40, 203. The grant was awarded to the City of Jonestown. In or around November 2010, representatives of the Comptroller's office executed the grant agreement. *See* State's Exh. 1.

Mary Jo Woodall, a long-time friend with whom the appellant maintained an intimate relationship, encouraged the appellant pursue this grant funding and even helped the appellant draft the grant application. *See* 7 RR 146. In addition, Woodall was actively involved in the company's operations. 7 RR 134.

At the time of the preparation and submission of the grant application to the Comptroller's office, Woodall was also employed by that office as a grant coordinator. Her duties included evaluating the City of Jonestown's grant

3

application and handling the very grant funds that she had encouraged the appellant, her intimate partner, to pursue. *See, e.g.*, 11 RR 61. At trial, the State presented evidence that Ms. Woodall's relationship with the appellate gave rise to a conflict of interest and that this conflict was never disclosed to the appropriate authorities within the Comptroller's office.

In connection with the application process, the appellant's company submitted a document to the City of Jonestown that contained the following false representation: "CM Alternative Energies, Inc., has determined there are no existing or potential conflicts of interest or possible issues that might create appearances of impropriety relative to the City's and our future subcontractor's submission of this application, possible selection as subcontractor, or our performance toward completion of a project." 19 RR 138-39. That document also represented that "CM Alternative Energies, Inc., has not had past or present contractual business, financial, or personal relationships with the comptroller." 19 RR 139.

The City's grant application included that document and also contained numerous false representations regarding the appellant's company and its wind turbine technology. For example, multiple witnesses testified at trial that the technology underlying the turbines had never advanced to a level that would have

4

enabled the turbines to generate the electrical output that was represented in that application, i.e., 20 kilowatts. *See, e.g.,* 9 RR 79 (testimony by project manager Justin Shepherd that "we never even got that high"); 10 RR 39 (when asked whether the appellant had a working wind turbine producing electricity, John Karlson, the master electrician employed by the appellant, responded, " No, nothing of the sort"); 7 RR 150 (testimony by the appellant's daughter, who was once the nominal president of the company, that "[t]here was never a full turbine. … I never saw a complete working turbine."); 9 RR 37 (testimony by Lance Wedell, the company's former marketing director, that, as of May 2011, the company had never built and marketed a wind-turbine product that could produce 20 kilowatts of power).[2]

The grant application prepared by the appellant also contained a representation that, "[t]he manufacturer's electric capability has been verified by a licensed master electrician with over 24 years' experience." 11 RR 17.  According to John Karlson—who was the only master electrician who worked on the appellant's wind-turbine project and whose years of experience matched statement—that representation was false.  9 RR 153; 11 RR 16-19, 41.

_____

[2]　　At one point during a hearing outside the presence of the jury, the trial judge observed, "clearly the State has put on several witnesses that said they [i.e., the wind turbines] didn't work. I mean, that's in evidence. " 13 RR 163-64.

5

The grant funds were not to be used for research and development. 9 RR 87. But, as one former employee told the jury, "[W]e were researching and developing the whole time." 9 RR 88.

Multiple individuals from the Comptroller's office testified that they would not have executed the grant agreement if they had known that representations in the grant application concerning the capabilities of the wind turbines were untrue or if they had known that the appellant had a prior and ongoing relationship with the grant coordinator, Ms. Woodall.

These facts and others will be addressed in greater detail below in relation to the appellant's points of error and the State's cross-point.

## SUMMARY OF THE ARGUMENTS

The appellant's first point of error

      In his first point of error, the appellant asserts that the trial court erred when it denied his motion to quash the indictment on grounds of selective prosecution. In a multifarious argument, the appellant also asserts additional claims, all of which should be rejected. The appellant's claim relating to the motion to quash the indictment has not been preserved for appellate review.

The appellant's second point of error

      In his second point of error, the appellant asserts that the trial court should have suppressed certain testimony because the State failed to preserve the appellant's wind turbines and other items for testing. That claim has not been preserved for appellate review. In yet another multifarious argument, however, the appellant asserts additional claims, all of which should be rejected. The appellant's spoliation claim lacked merit because the appellant failed to prove to the trial court that the exculpatory value of the destroyed items was apparent or that that the destruction of the evidence at issue resulted from bad faith on the part of the State. Moreover, any error was harmless.

The appellant's third point of error

      In his third point of error, the appellant asserts that the State violated *Brady*

by failing to disclose spreadsheets generated by the State's financial analyst and that the trial court therefore erred by failing to grant one or more of his motions for continuance. The State challenges the trial court's *Brady* ruling in a cross-point of error, which is addressed below. But even if it is assumed that the spreadsheets did constitute *Brady* evidence, the appellant's claim should be rejected because his motions for continuance were neither signed nor sworn and he has therefore failed to preserve his claim(s) for

for appellate review.

## The appellant's fourth point of error

In his fourth point of error, the appellant complains that the trial court erred when it denied his motion to quash the indictment on grounds of vagueness. That point lacks merit because the indictment tracks the statutory language that defines the offense.

## The State's cross-point of error

In a cross-point of error, the State asserts that the trial court erred when it ruled that the spreadsheets generated by the State's financial analyst (addressed in the appellant's third point of error) constituted material, exculpatory evidence that the State was required, by *Brady* and its progeny, to give to defense counsel. The trial court erred when it ruled that the spreadsheets contained or reflected

8

exculpatory evidence.  In addition, the court erred when it ruled that the

spreadsheets were material and when it ordered the State to give copies of the

spreadsheets to defense counsel.

## THE STATE'S REPLY TO THE FIRST POINT OF ERROR

THE TRIAL COURT SHOULD REJECT THE APPELLANT'S CLAIM THAT THE
TRIAL COURT ERRED WHEN IT DENIED HIS MOTION TO QUASH THE
INDICTMENT ON GROUNDS OF SELECTIVE PROSECUTION.

Argument and Authorities

In his first point of error, the appellant asserts, "The Trial Court Erred in Not

Quashing the Indictment Because Appellant was Selectively Prosecuted in

Violation of Due Process."  App. Brief at 3.  This point of error should be

overruled.

1. Background

On July 29, 2013, defense counsel filed the appellant's *Motion to Quash

Due to Selective Prosecution*.[3]  1 CR 183.  The State filed a written response on the

following day.  1 CR 201.  As the appellant makes clear in his brief, the trial court

expressly declined to rule on the *Motion to Quash Due to Selective Prosecution*.

*See* App. Brief at 4.  During the trial, the court made the following statement:

---

[3]    In addition, the appellant filed a separate motion to quash the indictment on the basis of other claims.  *See* 1
CR 14.

9

[T]here's one claim that the Defense makes that I think may have some separate merit that is clearly under the law an issue for the Court to decide, not the jury to decide, and that's the claim of selective prosecution; however, that claim is not waived and can be brought up in a motion for a new trial.

So what I am inclined to do with the motion for a selective prosecution -- I think that there are some issues there, but I also think that at this point we might not ever reach those issues depending on what happens with what the jury decides. **So I am going to make no ruling on that motion for selective prosecution right now** so that the Defense, should the jury come back with a guilty verdict, it's clear under the law that that is -- the Defense can raise that on a motion for a new trial which we would do quickly after the verdict. So that's -- I'm going to leave that issue open.

15 RR 22 (emphasis added).

The jury returned its guilty verdict on August 28, 2013. 20 RR 11. On September 24, 2013, the trial court assessed the appellant's punishment at imprisonment for a term of 15 years. 21 RR 27. The appellant's sentence was imposed in open court on that same date. *Id*.

On October 24, 2013, the appellant filed a motion for new trial, asserting, *inter alia*, as follows:

Defense counsel objected to the selective prosecution in this case. Defendant's name was not on the document which is the subject matter of this prosecution. The individuals who did sign said document was never charged. The trial judge did not rule on the objection, Appellate counsel is requesting that this Court reopen the hearing on this issue or rule on said motion.

10

1 CR 320.  On November 12, 2013, the trial court held a hearing on that motion, and the motion for new trial was denied in its entirety.  22 RR 4, 9.

## 2.  Nature of the appellant's claim

The appellant presents his first point of error as a challenge to the trial court's failure to quash the indictment.  *See*  App. Brief at 3 ("The Trial Court Erred in Not Quashing the Indictment Because Appellant was Selectively Prosecuted in Violation of Due Process").  In his supporting argument, however, the appellant attempts to assert a very different claim.  Specifically, his complaint about the trial court's failure to quash the indictment morphs into a challenge to that court's denial of his motion for new trial.  *See, e.g..,* App. Brief at 7 ("The trial judge's decision to deny the motion for new trial was both arbitrary and unreasonable because it was made without a hearing or calling witnesses, which would have further substantiated the defense position that the prosecution was arbitrary and for invidious purposes").[4]

---

[4] Because the appellant bases this point of error on more than one legal theory, his entire point of error is multifarious and should be overruled.  *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010) (citing Tex. R. App. P. 38.1); *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010) (citing *Wood v. State*, 18 S.W.3d 642, 649 n6 (Tex. Crim. App. 2000)); *Montemayor v. State*, 55 S.W.3d 78, 82 n.1 (Tex. App.—Austin 2001).

3. <u>The appellant's claim relating to the motion to quash the indictment has not been preserved for appellate review</u>

In general, two prerequisites must be satisfied in order to present a complaint for appellate review. *See* Tex. R. App. P. 33.1(a). First, the record must show that "the complaint was made to the trial court by a timely request, objection, or motion." Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Clay v. State*, 361 S.W.3d 762, 765 (Tex. App.—Fort Worth 2012, no pet.). Second, the record must show either that "the trial court … ruled on the request, objection, or motion, either expressly or implicitly" (Tex. R. App. P. 33.1(a)(2)(A)) or that "the trial court … refused to rule on the request, objection, or motion, and the complaining party objected to the refusal" (Tex. R. App. P. 33.1(a)(2)(B)).

These requirements apply to a motion to quash an indictment. *Perry v. State*, No. 02-13-00054-CR, 2014 Tex. App. LEXIS 249, *4-*5 (Tex. App.—Fort Worth Jan. 9, 2014) (not designated for publication) ("Complaints concerning the adequacy of an indictment are subject to forfeiture"); *see Prince v. State*, 137 S.W.3d 886, 887-88 (Tex. App.—Houston [1st Dist.] 2004); *Pacheco v. State*, No. 01-05-00391-CR ; 2006 Tex. App. LEXIS 921 (Tex. App.—Houston [1st Dist.] Feb. 2, 2006) (not designated for publication) ("Pacheco's failure to present evidence of an adverse ruling by the trial court waives any error arising from the

12

trial court's refusal to grant the motion to quash" the information). *See also*

*Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004) ("Except for

complaints involving systemic (or absolute) requirements, or rights that are

waivable only, which are not involved here, all other complaints, whether

constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule

33.1(a)").

To the extent that the appellant complains that "the trial court erred in not

quashing the indictment" (App. Brief at 3), that claim has been forfeited by the

appellant's failure to obtain an adverse ruling in relation to his motion to quash.[5]

---

[5]    It is assumed here, for the sake of argument, that the appellant satisfied the first prerequisite addressed above. *See* Tex. R. App. P. 33.1(a)(1) (the record must show that "the complaint was made to the trial court by a timely request, objection, or motion"). Article 1.14 provides that, if a defendant does not object to a defect in the form or substance of an indictment before the date on which the trial on the merits commences, he waives the right to object to the defect and may not raise it on appeal or in any other post-conviction proceeding. Tex. Code Crim. Proc. art. 1.14(b). Some courts have held that this provision requires not only that a motion to quash be filed before the first day of trial, but also that the motion be *presented* to the court before that date. *See, e.g., Mills v. State*, 941 S.W.2d 204, 208-209 (Tex. App.—Corpus Christi 1996), citing *Wilson v. State*, 398 S.W.2d 291, 293 (Tex. Crim. App. 1965) ("It has long been the rule in this Court that motions to quash must be presented prior to announcement of ready"). *But see, e.g., Whitsey v. State*, 853 S.W.2d 769, 772 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (motion filed but not presented until day of trial was timely).

In the instant case, the appellant's motion to quash the indictment was filed on July 29, 2013. 1 CR 183. During an arraignment proceeding on July 31, 2013, a visiting judge (the Honorable Mike Lynch) observed that the motion to quash, along with other motions, had been filed, and the visiting judge stated that the motions would be taken up by the presiding judge (the Honorable Karen Sage) either before or during the trial:

> A couple of other things. There are several motions that have been filed. Some
> records have been sealed by the Court today. The rest of the motions filed by the

13

Not only was there no ruling on the appellant's motion, but defense counsel

also never objected to the trial court's refusal to rule on that motion.  The ruling of

the First District Court of Appeals in *Prince* is instructive.  There, court ruled as

follows:

> [A]ppellant contends that the trial court erred in denying his motions
> to quash the information because the State practiced selective
> prosecution and vindictive prosecution…. Thus, appellant asserts, the
> trial court abused its discretion in denying his motions to quash.
>
> "It is a long-standing rule in this State that, absent an adverse ruling of
> the trial court, which appears in the record, there is no preservation of
> error." Although the record includes three separate motions to quash
> the information in cause number 1095415--and the trial court agreed
> to consider the motions after the case was re-filed under cause number
> 1137804--the record does not contain a ruling by the trial court on any
> of those motions. **By failing to present this Court with evidence of
> an adverse ruling to his motions to quash the information,
> appellant has waived any error arising from the trial court's
> refusal to grant any such motions.**
>
> We hold that appellant has failed to preserve error in regard to the trial
> court's refusal to quash his information.

---

parties will be taken up by Judge Sage next week either prior to trial or
appropriately during the trial, as she and the parties deem fit, including motions in
limine, motions to quash, motions to suppress, and any other motions filed in the
last few days will be taken up either prior to or during trial.

5 RR 8.

It appears from the record, however, that defense counsel did not orally urge the
appellant's motion until August 7, 2013.  *See* 7 RR 15.  Jury selection had been completed on
August 5, 2013.  6 RR 259.  The jury was sworn and opening statements were presented on
August 7, 2013.  7 RR 54, 57.

14

*Prince*, 137 S.W.3d 886, 887-88 (Tex. App.—Houston [1st Dist.] 2004) (citations omitted, emphasis added).

In the instant case, the record does not show that "the trial court … ruled on the request, objection, or motion, either expressly or implicitly." Tex. R. App. P. 33.1(a)(2)(A). Nor does the record show that "the trial court … refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." Tex. R. App. P. 33.1(a)(2)(B). It follows that the appellant's claim has not been preserved for appellate review.

4. <u>The trial court did not abuse its discretion when it overruled the appellant's motion for new trial</u>

To the extent that the appellant's first point of error challenges that court's denial of his motion for new trial, that point of error lacks merit.

   a. <u>Standards governing a trial court's ruling on a claim of selective prosecution</u>

"Prosecutors retain broad discretion in enforcing both the nation's and a state's criminal laws." *Roise v. State*, 7 S.W.3d 225, 243 (Tex. App.—Austin 1999). The presumption of regularity supports prosecutorial decisions. Thus, "in the absence of clear evidence to the contrary, the courts presume that they have properly discharged their duties." *Id.*, quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 71 L. Ed. 131, 47 S. Ct. 1 (1926). In general, "so long as the prosecutor has probable cause to believe that the accused

15

committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests in his discretion."  *Roise*, 7 S.W.3d 225, 243, quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 54 L. Ed. 2d 604, 98 S. Ct. 663 (1978).

Although prosecutorial discretion is broad, it is not exempt from constitutional restraints.  *Roise*, 7 S.W.3d at 243.  One such restraints, imposed by the Equal Protection clause of the Fifth Amendment, "is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.*, quoting *Oyler v. Boles*, 368 U.S. 448, 456. (1962).

Because of the presumption that all prosecutions are undertaken in good faith and in a nondiscriminatory fashion, the burden of establishing a *prima facie* case of selective prosecution rests upon the defendant.  *See Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980).  In other words, a defendant who asserts a claim of selective prosecution "has the burden of proving what the Supreme Court has termed 'the existence of purposeful discrimination.'" *Green v. State*, 934 S.W.2d 92, 103 (Tex. Crim. App. 1996).  That is a very heavy burden:

> To establish a *prima facie* case of selective prosecution, a defendant must provide "exceptionally clear evidence" that the decision to prosecute was for an improper reason.  This requires a showing that (1) the government has singled her out for prosecution even though

16

> the government has not proceeded against others similarly situated, and (2) the government's discriminatory selection is invidious, meaning it is based on impermissible considerations such as race, religion, or the exercise of a constitutional right.

*Saveika v. State*, No. 03-11-00070-CR, 2012 Tex. App. LEXIS 4553 at *15 (Tex. App.—Austin June 8, 2012) (not designated for publication), quoting *Gawlik*, 608 S.W.2d 671; *see Green*, 934 S.W.2d at 103.

If that *prima facie* showing is made, the burden then shifts to the State to justify the discriminatory treatment of the defendant. *Saveika*, 2012 Tex. App. LEXIS 4553 at *13; *see Ex parte Quintana*, 346 S.W.3d 681, 685-86 (Tex. App.— El Paso 2009, pet. ref'd) (citing *Johnson v. California*, 543 U.S. 499, 505 (2005)).

b.  Standards governing a trial court's ruling on a motion for new trial

When ruling on a motion for new trial, the trial courts plays a role in the appellate process, in the sense that the trial judge is afforded full opportunity to examine the completed record, hear arguments, study briefs, and grant a new trial to the same extent as would the appellate court. *Boutwell v. State*, 719 S.W.2d 164, 182 (Tex. Crim. App. 1986) (Clinton, J., Concurring).

The trial court may properly grant a motion for new trial "if the defendant: (1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in

17

Rule 44.2 of the Texas Rules of Appellate Procedure." *State v. Herndon*, 215 S.W.3d 901, 909 (Tex. Crim. App. 2007). "On the other hand, trial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial." *Id.*, 215 S.W.3d at 909.

In other words, a trial judge has authority to grant a new trial only if the first proceeding was not in accordance with the law. *Id.* at 907. A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Any error that does not affect substantial rights must be disregarded. Tex. R. App. P. 44.2(b).

The legal grounds for which a trial court *must* grant a motion for new trial are listed in Rule 21.3 of the Rules of Appellate Procedure, but that list is illustrative, not exclusive. *Herndon* at 907; *see* Tex. R. App. P. 21.3. A trial court *may* grant a motion for new trial on other legal grounds as well. *Id*.

c. The trial court did not abuse its discretion

If this Court reaches the merits of the appellant's claim regarding the denial of his motion for new trial, the trial court's ruling must be reviewed for abuse of discretion:

18

We review a trial judge's denial of a motion for new trial under an abuse of discretion standard. "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the record could support his ruling. We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party.

*Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014) (citations omitted).

Viewed in the light most favorable to the trial court's ruling, the record does not reflect any abuse of discretion. Here, the trial court could reasonably have concluded that the appellant failed to make a *prima facie* showing that the State engaged in purposeful discrimination on the basis of impermissible considerations such as race, religion, or the exercise of a constitutional right. Viewed in the requisite light, the record simply does not contain "exceptionally clear evidence" of either fact that the appellant was required to prove, i.e., (1) that the State singled the appellant out for prosecution even though it has not proceeded against others similarly situated, and (2) that such a discriminatory selection was based upon an impermissible consideration such as race, religion, or the exercise of a constitutional right. *See Gawlik*, 608 S.W.2d at 673; *Green*, 934 S.W.2d at 103; *Saveika*, 2012 Tex. App. LEXIS 4553 at *15.

19

But, as the State explained in its response to the appellant's *Motion to*

*Quash Due to Selective Prosecution*, there were legitimate bases for concluding

that the appellant and the individuals named his brief were not "similarly situated,"

and those other individuals may still face criminal prosecution:

> Defendant Cannot Show Selective Prosecution: One co-defendant,
> Mary Jo Woodall, has already been charged with the same level of
> offenses as this defendant for her involvement in this criminal
> scheme. Others may yet be charged, as the seven-year statute of
> limitations for securing execution of a document by deception has not
> run. Further, the State's witnesses and evidence have indicated that the
> Defendant was the individual who wrote the grant application at issue
> and founded the company that wrongfully obtained the grant funds.
> Therefore, the choice to proceed first against this defendant is a
> reasonable exercise of the State's prosecutorial discretion "which is
> historically a part of our criminal justice system." *United States v.*
> *Ojala*, 544 F.2d 940, 944 (8th Cir. Minn. 1976).

> Defendant Cannot Show Bad Faith: As noted above, the State's
> evidence suggests that the Defendant appears to have essentially been
> the mastermind of the criminal scheme at issue in this case. Therefore
> the decision to move forward against the Defendant first is a
> reasonable exercise of prosecutorial discretion. Moreover, Defendant
> has not demonstrated that the State's decision was in any way based
> on a bad faith or invidious reason such as race, gender, or the exercise
> of First Amendment Rights. See *Gawlik*, supra.

1 CR 202; *see also* 19 RR 183 (where prosecutor argues, "certainly I think

Mayor Armstrong signed the grant application and could face her own

criminal liability, but the defendant is who the witnesses have all testified

wrote this application"); 19 RR 186 (where prosecutor argues, "Absolutely

20

Mike Guevara signed the letter, and certainly he may share some liability as well. But the testimony is that the defendant wrote this grant.").

In his brief, the appellant argues, "In this case, the government has not elected to prosecute other individuals or companies who received federal and state grant monies and yet failed in the goals set forth in their grant applications. Additionally, aside from Mary Jo Woodall, many who signed or approved the grant application, including Mike Guevara, Deane Armstrong, Dan Dodson, and others in the case involving the Jonestown wind project were not prosecuted." App. Brief at 6. Defense counsel made similar assertions at trial. According to the appellant's brief, "Appellant was prosecuted because of his vocal criticism of the federal government and law enforcement in general." 8 RR 144, 152; 10 RR 38-39." App. Brief at 6; see also id. at 7, citing 13 RR 152 and 19 RR 60-64.

However, the portions of the record cited in the appellant's brief do not amount to "exceptionally clear evidence" that the State's decision to prosecute him was motivated by an improper reason. *Saveika*, 2012 Tex. App. LEXIS 4553 at *15, quoting *Gawlik*, 608 S.W.2d 671, 673; *see Green*, 934 S.W.2d at 103. At most, however, those portions of the record merely support the proposition that the appellant "never cared for the government" and "did not care for cops." 10 RR 39; see 8 RR 144 (testimony of Toby Miller that the appellant "wasn't real fond of the

21

federal government"); see also 8 RR 145 (testimony of Toby Miller that the appellant "left a voice mail message on [Michelle Cook's] phone that said, I can't stand cops. I hate cops...."). Conspicuously absent is evidence—either from the trial or from the hearing on the motion for new trial—establishing a causal connection between the appellant's "vocal criticism" and the State's exercise of its prosecutorial discretion. Indeed, the cited portions of the record are not even sufficient to support an *inference* that the prosecution of the appellant was initiated pursuant to an impermissible motive.

In light of the applicable standard of review and the legitimate reasons underlying State's prosecutorial decisions, this Court should find that the record supports the trial court's denial of the appellant's motion for new trial and that no abuse of discretion occurred. *See Colyer*, 428 S.W.3d 117, 122. Conclusion

For all of the reasons stated above, this Court should overrule the appellant's point of error.

**THE STATE'S REPLY TO THE SECOND POINT OF ERROR**

THIS COURT SHOULD REJECT THE APPELLANT'S CLAIMS RELATING TO THE SPOLIATION OF EVIDENCE.

Argument and Authorities

In his second point of error, the appellant asserts, "The State Permitted Crucial Evidence to be Destroyed Before Trial, and the Trial Court Should Have Suppressed One-Sided Testimony About that Evidence." App. Brief at 8. That point of error should be overruled.

1. Background

In July of 2012, the City of Jonestown gave the State 21 days' notice of the City's intent to dissemble the wind turbines. *See* 13 RR 223. On the day after it received that notice, the State notified the appellant's attorney, Dan Wannamaker, of the City's intention. 13 RR 22, 224-25. Mr. Wannamaker (who did not serve as the appellant's counsel at trial) apparently took no action, and the turbines were thereafter dissembled to some degree or destroyed.[6]

---

[6] The lead prosecutor concluded that Mr. Wannamaker's inaction resulted from a concern that any evaluation of the turbines might result in evidence that was inculpatory, not exculpatory, in nature. During a hearing outside the presence of the jury, she provided the following explanation:

> [T]he Defense had 20 days' notice after they were notified of the City's intention. If they wanted to preserve the turbines for testing, they could have done so. My impression from communicating with Mr. Wannamaker was that that was not the Defense's angle at that time and they did not want any evidence that would further show that the devices did not work.

23

Prior to the commencement of the trial, defense counsel filed the appellant's *Motion to Suppress Evidence Due to Spoliation.*  1 CR 179.  That motion asserted, *inter alia*, that "the State acted with bias against the Defendant and destroyed the evidence that would show the capabilities and capacities of the vertical wind turbines."  1 CR 181.  The *Motion to Suppress Evidence Due to Spoliation* was presented to the trial court on the first day of the trial on the merits, before the jury was sworn.  7 RR 15-17.  The court declined to rule on that motion.  7 RR 21; 14 RR 32, 34.  Defense counsel did not object to the trial court's failure to rule.

On October 24, 2013, the appellant filed a motion for new trial.  1 CR 320.  On November 12, 2013, the trial court held a hearing on that motion, and the motion for new trial was denied in its entirety.  22 RR 4, 9.

2. The appellant's point of error is multifarious and should be overruled

The appellant presents his second point of error as a challenge to the trial court's failure to suppress evidence.  App. Brief at 8.  In his argument, however, the appellant expands that claim, adding that the trial court also erred by denying a

---

Furthermore -- so I don't think that they wanted the turbines preserved. I believe that was a decision made by the Defense at the time, and now we have a different attorney in charge and a different decision was made, but certainly there was no bad faith on the part of the State. We notified the Defense immediately.

13 RR 225 (emphasis added).

24

motion for mistrial and by denying his motion for new trial. *See, e.g.,* App. Brief

at 15.

Because the appellant bases this point of error on more than one legal

theory, his entire point of error is multifarious and should be overruled. *See Davis*

*v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010) (citing Tex. R. App. P.

38.1); *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010) (citing *Wood v.*

*State*, 18 S.W.3d 642, 649 n6 (Tex. Crim. App. 2000)); *Montemayor v. State*, 55

S.W.3d 78, 82 n.1 (Tex. App.—Austin 2001).


3. <u>To prevail, the appellant must prove that the exculpatory value was apparent when the evidence was destroyed and that the State acted with bad faith</u>

The Due Process Clause does not impose upon the State "an undifferentiated

and absolute duty to retain and to preserve all material that might be of conceivable

evidentiary significance in a particular prosecution." *Arizona v. Youngb*lood, 488

U.S. 51, 58 (1988). Instead, "that duty must be limited to evidence that might be

expected to play a significant role in the suspect's defense." *California v.*

*Trombetta*, 467 U.S. 479, 488 (1984). Under that standard, a defendant can

establish a violation of due process only by making an affirmative showing that the

missing evidence was both favorable and material. *United States v. Valenzuela-*

*Bernal*, 458 U.S. 858, 873 (1982); *Hebert v. State*, 836 S.W.2d 252, 254 (Tex.

App.—Houston [1st Dist.] 1992).

Significantly, "[a] showing that the lost evidence *might have been* favorable does not meet the materiality standard." *Id*. (emphasis in original); *accord Salazar v. State*, 185 S.W.3d 90, 92 (Tex. App.—San Antonio 2005); *Hooper v. State*, No. 03-08-00125-CR, 2009 Tex. App. LEXIS 7880 (Tex. App.—Austin Oct. 9, 2009) (not designated for publication). In other words, evidence that is only *potentially* useful to a defendant at the time of its loss or destruction does not constitute material exculpatory evidence. *See Ex parte Napper*, 322 S.W.3d 202, 230 (Tex. Crim. App. 2010), citing *Illinois v. Fisher*, 540 U.S. 544, 545, 124 S. Ct. 1200, 157 L. Ed. 2d 1060 (2004).

Thus, in order for there to be a due process violation, "the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed.'" *Youngblood*, 488 U.S. 51, 56 (emphasis in original), quoting *Trombetta*, 467 U.S. 479. In *Youngblood*, the Supreme Court articulated the standard governing the resolution of claims involving the loss or destruction of "potentially useful evidence":

> [U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

26

*Youngblood*, 488 U.S. 51, 58; *see Napper*, 322 S.W.3d 202, 231 (emphasizing that, "[w]hen evidence is *at best* 'potentially useful,' then the defendant must *at least* show 'bad faith'").

Included within the term "potentially useful evidence" is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. "Professors Dix and Dawson suggest that the 'possibility' of exculpation is not enough—that the defendant 'must apparently show at least a substantial or considerable likelihood the evidence, if preserved, would have tended to show his innocence.'" *Napper*, 322 S.W.3d 202, 231 (Tex. Crim. App. 2010), quoting George E. Dix and Robert O. Dawson, 42 TEXAS PRACTICE, 2nd ed., § 22.64 (2001). Indeed, some courts have held that evidence is not even potentially useful when the claim of exculpatory value is based only upon "mere speculation." *Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir. 1992); *see United States v. Jobson*, 102 F.3d 214, 219 (6th Cir. 1996) ("There is no evidence of any kind that the dispatch tape would contain such exculpatory information" because "[n]o one ever listened to the tape").

Addressing the requirement of proof of bad faith, the Supreme Court explained, "'[W]henever potentially exculpatory evidence is permanently lost,

27

courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' … We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood* at 58, quoting *Trombetta*, 467 U.S. 479.

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56. Bad faith may exist, for example, if police act with "official animus" toward the defendant or with "a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. 479, 488; *see generally Napper*, 322 S.W.3d at 231-35.

4. <u>The appellant's claim that the trial court erred by failing to suppress evidence has not been preserved for appellate review</u>

To the extent that the appellant complains that the trial court erred by failing to suppress testimony about the destroyed evidence (*see* App. Brief at 8), that claim has been forfeited by the appellant's failure to obtain an adverse ruling in relation to his suppression motion.

28

As was pointed out above in the State's reply to the first point of error, two prerequisites must generally be satisfied in order to present a complaint for appellate review. *See* Tex. R. App. P. 33.1(a). First, the record must show that "the complaint was made to the trial court by a timely request, objection, or motion." Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Clay v. State*, 361 S.W.3d 762, 765 (Tex. App.—Fort Worth 2012, no pet.). Second, the record must show either that "the trial court … ruled on the request, objection, or motion, either expressly or implicitly" (Tex. R. App. P. 33.1(a)(2)(A)) or that "the trial court … refused to rule on the request, objection, or motion, and the complaining party objected to the refusal" (Tex. R. App. P. 33.1(a)(2)(B)).

In the instant case, the second prerequisite has not been satisfied. There was no ruling on the appellant's motion, and defense counsel never objected to the trial court's refusal to rule on that motion. *See* Tex. R. App. P. 33.1(a)(2).

5. <u>This Court should reject the appellant's claim that the trial court erred by denying his motion for mistrial</u>

The appellant asserts, *inter alia*, "The trial court erred … in not granting a mistrial…" [7] App. Br. at 15. However, the appellant concedes that "[t]he trial

---

[7] A mistrial is a device used to halt trial proceedings when an error is so prejudicial that the expenditure of further time and expense would be wasteful and futile. *Simpson v. State*, 119

court declined to rule on appellant's … motion for mistrial…" App. Brief at 8.

Importantly, the appellant has not identified any objection to the trial court's

failure to rule on that motion.[8] Nor has he identified any adverse ruling on such an

objection. Consequently, the appellant has failed to establish that his claim has

been preserved for appellate review. *See* Tex. R. App. P. 33.1(a)(2). This claim

should therefore be rejected.

6. <u>The appellant failed to preserve his claim that the trial court erred by overruling his motion for new trial</u>

A challenge to the denial of a motion for new trial is not preserved for

appellate review if "the complaint in the motion for new trial does not comport

with the complaint on appeal." *Tamminen v. State*, 653 S.W.2d 799, 807 (Tex.

Crim. App. 1983); *see Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App.

---

S.W.3d 262, 272 (Tex. Crim. App. 2003), cert. denied, 542 U.S. 905 (2004); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). "Mistrial is appropriate for only 'highly prejudicial and incurable errors.'" *Simpson*, 119 S.W.3d at 272, quoting *Wood* at 648. On appeal, a trial court's ruling on a motion for mistrial is reviewed for abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

[8] The appellant fails to even identify the particular motion to which he refers. This is not an insignificant matter, because defense counsel made more than one motion for mistrial during the trial, and the bases for those motions were not identical. One such motion, for example, related solely to the State's allegedly tardy disclosure of a spreadsheet. *See* 12 RR 11-12. Because of this failure to specify the particular motion at issue, the appellant's claim is inadequately briefed and should be rejected on that basis alone. *See* Tex. R. App. P. 38.1; *Hankins v. State*, 132 S.W.3d 380, 385 (Tex. Crim. App. 2004); *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000). Neither the State nor the Court should be forced to search the voluminous appellate record in an attempt to identify the motion that forms the basis of the appellant's claim.

30

1995); *Shotwell v. State*, No. 10-12-00166-CR, 2013 Tex. App. LEXIS 8665 at *5-*6 (Tex. App. –Waco July 11, 2013) (not designated for publication).

In the argument accompanying his second point of error, the appellant refers to his *Motion to Suppress Evidence Due to Spoliation*, which asked the trial court "to suppress all evidence regarding the capacities and capabilities of the vertical wind turbine constructed for the City of Jonestown wind energy project." 1 CR 179. As the basis for that suppression motion, the appellant asserted, *inter alia*, that "the State acted with bias against the Defendant and destroyed the evidence that would show the capabilities and capacities of the vertical wind turbines." 1 CR 181. More specifically, the appellant claimed in the suppression motion that the wind turbines "were crudely dismantled and improperly stored," that "the parts from each turbine cannot be identified and re-associated with each turbine that was erected," and that the State's actions "ma[de] it impossible to test the wind turbines as they existed prior to the Defendant's arrest." 1 CR 180.

In his brief, the appellant suggests that his spoliation claim was also asserted in his motion for new trial. *See, e.g., App. Brief* at 8 ("The trial court declined to rule on appellant's objections and motion for mistrial until the motion for new trial hearing, when they were denied"); *id.* at 15 ("The trial court erred in not granting

31

the motion to suppress all evidence about the capabilities and capacity of the turbines, in not granting a mistrial, and in not granting a new trial").

In actuality, however, no such spoliation claim was articulated in the appellant's motion for new trial. Instead, the motion asserted only the following claims:

> A. Defense counsel objected to the selective prosecution in this case. Defendant's name was not on the document which is the subject matter of this prosecution. The individuals who did sign said document was never charged. The trial judge did not rule on the objection, Appellate counsel is requesting that this Court reopen the hearing on this issue or rule on said motion.
>
> B. Defense counsel filed a motion to suppress the search of Defendant's residence and properties as well as the search of Mary Jo Woodall residence and property. Woodall had a hearing dealing with this issue. That hearing was held in this Court and this Court had access to that information when it ruled on Defendant's motion. Defense would request that this Court incorporate the hearing in the Woodall suppression hearing into the record of this cause.
>
> C. The verdict is contrary to the law and the evidence.

1 CR 320-21.

The claim set forth in paragraph (A) of the appellant's motion for new trial clearly does not assert a spoliation claim. Nor does the claim asserted in paragraph (B) of that motion. While paragraph (B) does address a suppression issue, that issue differs from the one asserted in the *Motion to Suppress Evidence Due to Spoliation*. Instead, paragraph (B) relates to the request made in *Defendant's Brief*

*on the Application of a Franks v. Delaware Suppression Ruling to a Co-Defendant's Case*, which asked the trial court "to suppress the items located in the home of Mary Jo Woodall on the basis of his own standing…"  1 CR 243.  *See also Motion to Suppress Evidence and Motion for Franks Hearing.*  2 CR 16 (asking the trial court "to suppress the evidence acquired pursuant to the searches of Defendant's residence and places of work because the affidavits supporting the warrants contained material misrepresentations and omissions thereby rendering the warrants devoid of probable cause").

The vague language of paragraph (C) of the motion for new trial arguably presented an avenue for the appellant to articulate a spoliation claim during the hearing on the motion for new trial.  The appellant's attorney, however, addressed the claims set forth in paragraphs (A) and (B) of the motion for new trial but did not assert any spoliation claim during that hearing.

Accordingly, this Court should conclude that the claim asserted on appeal does not comport with the claims asserted in the motion for new trial, even though the appellate claim mirrors the assertions in the *Motion to Suppress Evidence Due*

*to Spoliation.*[9]  *See Tamminen*, 653 S.W.2d 799, 807; *Broxton*, 909 S.W.2d 912, 918.

   7.  The appellant's spoliation claim lacked merit

   If this Court finds that the trial court actually did (in any of the contexts addressed in the appellant's multifarious point of error) reject the appellant's spoliation claim, and if this Court reaches the issue of whether the trial court erred by doing so, the Court should find that the trial court did not abuse its discretion. The trial court could reasonably have rejected that spoliation claim for several reasons, one of which is that the appellant failed to prove to the trial court that the claim satisfied either of the two *Youngblood* requirements.  First, there was no showing that the State knew, before the evidence was destroyed, that it had exculpatory value.  *See Youngblood*, 488 U.S. 51, 56 (emphasizing that "the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed'").  On the contrary, the record supports the conclusion that the exculpatory value (if any) was <u>not</u> apparent, even at the time of the trial.  *See, e.g.,* 16 RR 118 (when asked to state the primary reasons why the turbines and other items in Jonestown were not seized, Sgt. Lori Carter, the State's lead investigator, responded, "Well, for one, it was really irrelevant that they had this 40-foot tall,

---

[9]      The appellant's complaint about the trial court's failure to grant that suppression motion is a separate issue, and that claim should be rejected for the reasons set forth above.

20-foot in diameter turbine. They didn't have one at the time that they applied for the grant monies. And then, secondly, I don't understand what the purpose would have been to collect all of that material and store it somewhere. For what?"); *see also* 16 RR 118-19 (where Sgt. Carter adds, "Travis County would have had to have hired somebody to bust out all of that concrete and then hire somebody to disassemble the thing and then hire a crane operator to transport it to some storage facility and pay for storage, and for what purpose, I don't know.").

Indeed, the trial court could reasonably have concluded that the appellant's claim of exculpatory value was, at best, wholly speculative. *See Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir. 1992); *United States v. Jobson*, 102 F.3d 214, 219 (6th Cir. 1996). This is especially true in light of the fact that several individuals testified at trial that the turbines were incapable of generating the electrical output that was represented in that application, i.e., 20 kilowatts. *See, e.g.,* 9 RR 79 (testimony by project manager Justin Shepherd that "we never even got that high"); 10 RR 39 (when asked whether the appellant had a working wind turbine producing electricity, John Karlson, the master electrician employed by the appellant, responded, " No, nothing of the sort"); 7 RR 150 (testimony by the appellant's daughter, who was once the nominal president of the company, that "There was never a full turbine. … I never saw a complete working turbine."). In

35

addition, the lead prosecutor informed the trial court, outside the presence of the jury, of her conclusion that, when the appellant's previous attorney took no action in response to the City of Jonestown's notice of intent to destroy the turbines, the defense counsel's inaction resulted from a concern that any evaluation of the turbines might result in evidence that was inculpatory, not exculpatory, in nature. *See* 13 RR 225 ("My impression from communicating with Mr. Wannamaker was that that was not the Defense's angle at that time and they did not want any evidence that would further show that the devices did not work").

In addition, the trial court could reasonably have concluded that the appellant failed to satisfy the second *Youngblood* requirement, i.e., that the destruction of the evidence at issue resulted from bad faith on the part of the State. *See Youngblood*, 488 U.S. 51, 58[ ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Defense counsel did not identify, in the motion for new trial or in the hearing on the motion, any persuasive evidence that the State acted with "official animus" toward him or with "a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. 479, 488. In fact, the record suggests that the State had no such animus. The State, for example, promptly notified the appellant's previous attorney (Mr. Wannamaker) about the City of

36

Jonestown's intent to destroy the evidence.  As the lead prosecutor explained, "the Defense had 20 days' notice after they were notified of the City's intention. If they wanted to preserve the turbines for testing, they could have done so."  13 RR 225.

Finally, the trial court could reasonably have found that the appellant's spoliation claim was barred by the doctrines of waiver and estoppel.  In July of 2012, the appellant's previous attorney, Mr. Wannamaker, received 20 days' notice of the City of Jonestown's intent to dissemble the wind turbines.  However, Mr. Wannamaker apparently took no action, and the turbines were thereafter dissembled to some degree or destroyed.  *See* 13 RR 223, 225.  Assuming that the destruction occurred no less than 20 days after Wannamaker received that notice, that destruction did not take place until roughly eight months or more after the appellant was first indicted in this case.  The initial indictment was handed down on December 22, 2011.[10]  2 CR 61.  The appellant has not identified any evidence that the appellant or his attorney made any attempt—during that period of eight months or more—to have the turbines tested or preserved for testing.

Consequently, the trial court could reasonably have rejected the spoliation claim on waiver or estoppel grounds, because the appellant and defense counsel did nothing but lie behind the proverbial log and sandbag the State and the trial

---

[10]     The appellant's arrest occurred even earlier, on or about October 11, 2011.  *See* 13 RR 221.

court with this claim. *See State v. Holloway*, 886 S.W.2d 482, 485 (Tex. App.—

Houston [1st Dist.] 1994); *Kissee v. State*, 733 S.W.2d 361, 363 (Tex. App.—San

Antonio 1987) (citing *Bradley v. State*, 688 S.W.2d 847, 852 (Tex. Crim. App.

1985)). In essence, the appellant sought to have "two bites at the apple," first by

acquiescing in the destruction of items that might have yielded additional

*inculpatory* evidence and then by complaining that such destruction deprived him

of *exculpatory* evidence. *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App.

1998). Thus, if the trial court did actually reject the appellant's spoliation claim, it

did not abuse its discretion by doing so.[11]

---

[11] The appellant asserts, erroneously, that "the State conceded the spoliation issue by volunteering not to call its expert…." App. Brief at 15. The record clearly reflects multiple statement by the lead prosecutor (Holly Taylor) that the State was <u>not</u> making any such concession. For example, the record reflect the following exchange between Ms. Taylor and defense counsel:

> MS. TAYLOR: …<u>Without conceding any legal validity to the arguments</u>, the State, nonetheless, has offered, basically, for -- in response to that objection, the State gave the Defense the option of whether or not the State would call Dr. Nelson, acknowledging that Dr. Nelson is a wind energy expert and he could help the State's case and that they might have limitations on cross-examining him, at least as they've set them out, but at the same time we acknowledge that they might want to cross-examine him to develop their issue in front of the jury concerning the turbines.
> So we basically gave the Defense a choice as to whether we call Dr. Nelson and I told them it's up to them, and I'll let Tamara respond.
> MS. NEEDLES: So we have an answer, is that we would like to actually call him and have him questioned on voir dire about our motion for … spoliation …
> That's our plan, is to call him just in front of the Court on our motion, to be questioned on the motion so that you can hear that.

38

8. <u>Any error was harmless</u>

If this Court reaches the merits of any of the claims asserted in the

appellant's second point of error and finds that the trial court erred, the Court

should find that any such error was harmless. Here, the reindictment in this case

required the State to prove, among other things, that the appellant caused the grant

agreement to be signed and executed by the following deceptions:

> (1) by creating false impressions of fact in the City of Jonestown's
> grant application and its attachments concerning the qualifications and
> capabilities of Charlie Malouff's company … and its wind turbine
> technology likely to affect the judgment of representatives of the
> Comptroller's Office in the grant agreement transaction, and that
> Charlie Malouff did not believe to be true; and
> (2) by preventing representatives of the Comptroller's Office from
> acquiring information likely to affect their judgment in the
> transaction, specifically, the fact that the Jonestown grant application
> and its attachments contained false and misleading information about
> CME and its wind turbines and the fact that Malouff had a prior and

---

13 RR 161 (emphasis added).

Shortly thereafter, the lead prosecutor again pointed out that the State was not conceding
the spoliation issue:

> MS. TAYLOR: We are fine with the Defense making the argument that we have
> not conclusively proven in some way - <u>I'm not conceding the validity of this
> argument</u> - that they could not have worked, okay, if built. That is okay with me. I
> just don't want an implication that the State withheld expert testimony on this
> issue.
> THE COURT: That's fine. I mean, clearly the State has put on several witnesses
> that said they didn't work. I mean, that's in evidence.

13 RR 163-64 (emphasis added).

ongoing personal and business relationship with the grant coordinator assigned to this grant…

1 CR 7 (emphasis added).

All of the claims asserted by the appellant in this point of error appear to be predicated upon the notion that the destroyed items had exculpatory value in relation to the allegations above concerning "the qualifications and capabilities of Charlie Malouff's company … and its wind turbine technology" and the allegation that "the Jonestown grant application and its attachments contained false and misleading information about CME and its wind turbines." 1 CR 7.

Significantly, the destroyed items could not possibly have had any exculpatory value in relation to the allegation that "Malouff had a prior and ongoing personal and business relationship with the grant coordinator assigned to this grant." 1 CR 7. In other words, even if it is assumed, *arguendo*, that testing of those items would have conclusively established that the turbines were, at all relevant times, commercially available, readily deployable, capable of generating 20 kW per system, and equipped with the requisite energy storage systems, such testing simply could not have rebutted the State's evidence that the appellant prevented representatives of the Comptroller's Office from learning about his prior and ongoing personal and business relationship with Mary-Jo Woodall.

Defense counsel maintained that the appellant and Woodall "were pretty

40

darn open" about their relationship. 19 CR 166; *see also* 2 CR 179 (where defense

counsel, in a *Franks* motion, characterized the relationship as "open and

notorious"). The evidence before the jury, however, was sufficient to support a

finding that the appellant did in fact prevent representatives of the Comptroller's

Office from learning about the relationship. The State presented, for example, the

following testimony from the lead investigator:

> Q. (BY MS. TAYLOR) Okay. With regard to your questioning of the
> comptroller's office employees, okay, did you find that any of them,
> other than Pam Groce, had knowledge that Mary-Jo was dating the
> proprietor of a subcontractor on one of the grants she was managing?
> A. No, they did not know that.

19 RR 146-47; *see e.g.,* 12 RR 99 (testimony of Comptroller's former Assistant

General Counsel Clay Harris).

And Pam Groce, a Comptroller employee who know about the relationship,

lamented the fact that she failed to inform other Comptroller personnel about this

conflict of interest:

> Q. Now, we've talked about this, Pam. Should you have disclosed to
> your supervisor that Mary-Jo and Charlie Malouff were working
> together on a grant and the turbines?
> A. In my heart of hearts, yes, I should have said something just to
> make sure that they knew.

11 RR 136. Even Groce was unaware, when she was evaluating this grant

application, that the appellant was associated with the company that would be the

subcontractor receiving this grant money. 11 RR 122; *see also* 1 RR 57-58

(testimony by Comptroller employee that he knew about the relationship between

that appellant and Woodall but "didn't know Charlie was involved in CM

Energies").

The alleged deception relating to the appellant's relationship with Woodall

formed an independent basis for the jury's verdict, separate and apart from the

deceptions that were alleged to have been made in relation to "the qualifications

and capabilities of Charlie Malouff's company … and its wind turbine

technology." Because testing of the destroyed evidence could have rebutted the

evidence relating to the illicit relationship, any error committed by the trial court in

relation to the spoliation claim could not have contributed to the appellant's

conviction or punishment and was necessarily harmless. *See* Tex. R. App. P.

44.2(a); *State v. Vasquez*, 230 S.W.3d 744, 749 (Tex. App.—Houston [14th Dist.]

2007).

**THE STATE'S REPLY TO THE THIRD POINT OF ERROR**

THIS COURT SHOULD REJECT THE APPELLANT'S CLAIM THAT TRIAL COURT ERRED BY DENYING ONE OR MORE OF HIS REQUESTS FOR CONTINUANCE.

Argument and Authorities

In his third point of error, the appellant asserts, "The State Violated *Brady v. Maryland* and the Trial Court Erred by Not Granting the Appellant More Time and the Assistance of an Expert to Digest the State's Tardy Disclosures." App. Brief at 15. That point of error should be overruled.

1. Introduction

In a cross-point of error, which is set forth below in this brief and incorporated herein by this reference, the State asserts that the trial court erred when it ruled that the spreadsheets at issue in the appellant's third point of error constituted material, exculpatory evidence that the State was required, by *Brady* and its progeny, to produce to defense counsel.[12] To the extent that the appellant's

---

[12]    Under *Brady v. Maryland*, 373 U.S. 83 (1963), the State has an affirmative duty to disclose favorable, material evidence to the defense. *See Brady*, 373 U.S. at 87. Favorable evidence is any evidence that, if disclosed and used effectively, may make the difference between conviction and acquittal. *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). Favorable evidence includes both exculpatory and impeachment evidence. *Id*. Exculpatory evidence is that which tends to justify, excuse, or clear the defendant of fault or guilt. *Id*. Impeachment evidence is evidence that is offered to dispute, disparage, deny, or contradict a witness's testimony. *Id*.

Evidence is material, for purposes of the standard *Brady* analysis, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

requests for continuances were predicated upon the notion that production of the spreadsheets was required under *Brady*, this Court should sustain the State's cross-point and rule that the trial court erred by ordering the State to give copies of the spreadsheets to defense counsel. Further, this Court should overrule the appellant's third point of error for the reason that defense counsel was not entitled to any continuances for the purpose of reviewing and digesting the State's work product, which the State had erroneously been ordered to provide to defense counsel.

But even if it is assumed, for the sake of argument, that the spreadsheets did constitute *Brady* evidence, the appellant's third point of error should be overruled because the appellant's claim has not been preserved for appellate review and also because the trial court did not abuse its discretion by failing to "grant[] the appellant more time and the assistance of an expert to digest the State's tardy disclosures." App. Brief at 15.

## 2. Factual and procedural background

During the trial, the State presented testimony from Robin Timmins, a CPA who, during the investigation of this case, had been employed by the District Attorney's Office as a financial analyst. At some point before the trial

proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

commenced, Ms. Timmons ended her employment with the District Attorney's and began working as a senior auditor with a CPA firm in McAllen, Texas. 12 RR 179. The following events occurred during the trial:

a. Tuesday, August 13

When cross-examining Ms. Timmins on Tuesday, August 13, 2013, defense counsel was permitted (apparently pursuant to Rule 612) to review a spreadsheet that had been generated by Ms. Timmins. *See* Tex. R. Evid. 612 ("Writing Used to Refresh Memory"). The defense attorney approached the bench and requested a hearing outside the presence of the jury, stating, "[T]his is *Brady*. I have requested them before. I was shocked that this money never got chased, and now I'm finding out it did get chased." 12 RR 231.

During the hearing that followed, the lead prosecutor, Holly Taylor, stated, *inter alia*, as follows:

> MS. TAYLOR: Yes, Your Honor. I think that she's referring to some work product that Ms. Timmins prepared when she was employed with our office. She was one of the people that was part of our team, and it was her work product; however -- and we provided all of the bank records which provide evidence of all of these transactions, and it's not something -- in fact, it's part of our case, so it's not something that we have hidden. She did prepare some work product that I didn't have copies of. As Ms. Timmins stated, she then moved down to the Valley. She, I think, has looked through some boxes and actually located those spreadsheets, and I'm happy to provide them now, but it's nothing the Defense doesn't already know. They've had the bank records, I believe, for months. They have gotten it through discovery.

45

12 RR 233; *see also* 12 RR 235-36 (where Ms. Taylor added, "the fact that these checks went back into that account is nothing that we have in any way tried to hide; in fact, it's reflected in the flowchart that we just introduced in evidence").

During that hearing, the court suggested the possibility of a continuance and ruled that the State was obligated under *Brady* to provide the spreadsheets to defense counsel:

> THE COURT: Ms. Wood, I take your point.
> Here's the deal. The fact that you didn't know about it until today, I mean, clearly she is an employee of the DA's office and all of your Brady obligations go with everything she created, okay? And I'm not going to find that there's bad faith, but I do want that handed over today.
> If the Defense -- and I really believe that if the Defense needs to move for a continuance based on what's in there, that they might be entitled to a day or two continuance. I mean, there might be -- this is definitely, clearly a critical part of their case. It's clearly something that was in the State's possession.
> You know, I'm not making rulings of bad faith on anybody's behalf.

12 RR 236; *see also* 12 RR 236-37 ("THE COURT: … And if tomorrow morning Ms. Wood comes to me and says I need a continuance to take longer to look at this, I may have to grant a continuance so that she can be able to review it in time."); 12 RR 238 ("THE COURT: … I think it should have been provided beforehand.  I think the Defense is entitled to it.").

46

At the conclusion of the hearing, the trial court summarized its ruling in the following manner:

> THE COURT: If there are any CME, CME International, any of the grant accounts or the defendant's accounts that there were spreadsheets done from, I think the Defense is entitled to them. If the State for any reason thinks they're work product such that they shouldn't be, then I want to see them in-camera and make that determination myself. If you want to maintain a work product, I will take a look at them and see, if there's something you think that is clearly not Brady and that is entitled to work product production, but I don't want anything -- I don't want anything withheld….

12 RR 238-39. The trial court then recessed the proceedings until the following morning, which was Wednesday, August 14, 2013. 12 RR 239-40. The spreadsheets at issue consisted of eight pages. 13 RR 24.

b. Wednesday, August 14

On Wednesday, the court and counsel (but not the appellant) met in chambers and had a lengthy discussion on the record. *See* 13 RR 7-35. When the hearing convened in the courtroom (and in the appellant's presence), defense counsel made an oral request for a continuance and also "asked the Court for additional monies for expertise so that we can combat, basically, the money trail that ends up right back to where it was supposed to go." 13 RR 37. Defense

47

counsel also requested that the court provide funding for two additional experts, i.e., an expert on contract law and an expert on digital evidence.[13]  13 RR 37-38.

In response, the lead prosecutor reiterated that the spreadsheets were the work product of Ms. Timmins and that the bank records on which the spreadsheets were based had been provided to defense counsel during the previous November.  13 RR 38-39.  The prosecutor also advised the court that "[t]he State has no problem with providing its work product to the Defense and has done so repeatedly."  13 RR 39.  The prosecutor added, "This was an unintentional oversight due to the fact that the employee that developed the spreadsheets had left the office and they hadn't been saved. The State apologized for that and is happy to agree to a continuance, and we've already discussed in chambers different options that the State is happy to provide with regard to a continuance so that the Defense has a chance to go over those spreadsheets."  13 RR 39.

In addition, the prosecutor responded to defense counsel's contention that the spreadsheets were exculpatory because they showed that "[t]he money went where it was supposed to go to."  13 RR 34.  Explaining why the appellant (who was charged with securing the execution of documents by deception) was not

---

[13]    Before requesting the continuance, defense counsel requested "a dismissal based on prosecutorial misconduct."  13 RR 24.  When that request was denied, defense counsel moved for mistrial.  That motion was also denied.  *Id*.  Defense counsel then made the motion for a continuance and the funding request.  *Id*.

exculpated by the information in the spreadsheets showing that the bulk of the

grant money was spent on the appellant's company, the prosecutor stated:

> [T]he State does not concede that her spreadsheets indicate that
> the money went where it was supposed to go. The nutshell of the
> State's case is that lies were contained in the grant application. I
> believe that all of the State's evidence has pointed to that.
> The State's case is not a theft case and it never was.

13 RR 40.

The trial court granted the appellant's motion for continuance and his

request for funding of experts:

> THE COURT: Okay. So the motion for continuance is granted, as we
> discussed earlier, with the exception we are going to bring Ms.
> Timmins on to do some questioning outside the presence of the jury
> and then we'll continue with other witnesses that are not related to
> financial matters today, break today, and as of right now the
> continuance is granted through Monday morning and then we'll
> reassess at that time where we're at.
> The Defense motions for the experts they need are granted as
> well.

13 RR 42-43.

### c. Friday, August 16

On the morning of Friday, August 16, 2013, the parties appeared in court

while the trial was in recess. *See* 14 RR 4. During that hearing, Ms. Taylor, the

lead prosecutor, described the extent of the discovery that had been provided to

defense counsel in this case. She reiterated that the spreadsheets at issue merely

summarized information contained in the bank records that had previously been

provided to defense counsel, pointing out that such discovery had actually occurred

a year and a half earlier:

> In February of 2012, prior to that, we had first provided all of the bank
> records that are at issue in this case to the Defense. These bank
> records are the best evidence concerning the financial events at issue.
> And Robin Timmins' work product, in our opinion, is merely
> regurgitating the content of those records.
>
> So we provided that primary evidence to the Defense first in
> February of 2012. And under Article 39.14 of the Code of Criminal
> Procedure, the work product exception applies to the work product of
> counsel and their investigators and their notes. Further, these rights
> herein granted shall not extend to written communications between
> the State or any of its agents or representatives or the employees. Ms.
> Timmins was, at the time, an employee of the State and acting in a
> capacity effectively as an investigator for our office.

14 RR 8.

Ms. Taylor also pointed out that "[t]he Defense has … the very person that

spent the money and decided on where the money went at their table, so they can

use that to their advantage in evaluating these transactions."  14 RR 19-20.

Perhaps most significantly, the lead prosecutor expressed an intention to "do

everything in our power to facilitate the resolution in an equitable manner."  14 RR

21.  She made the following proposal:

> We will concede that all but $100,000 of the grant money was spent
> on the company and not on frivolities; and, in fact, we've already
> presented an exhibit and published it to the jury with no objection that
> showed that very thing.

50

***

We ideally would like to try to finish this trial by the end of next week because that's what we told the jury and because we don't want them to get too far away from the evidence that they've heard, and we are willing to do everything we can to assist the Defense in this endeavor to try to make this happen.

For example, as I stated, we are having Barbara Terry [i.e., a senior forensic analyst employed by the District Attorney's office] do the spreadsheet right now that itemizes in a detailed spreadsheet of every transaction on the CM Energies International account. We could, furthermore, facilitate the interview and questioning with Robin Timmins. We will stipulate to the fact that the defendant lost money, and we will stipulate to the fact that very, very much of those checks from Central Texas Plastics back to CM Energies International then went back to CM Alternative Energies. We will not object to the Defense entering in Robin Timmins' flowchart which we provided to the Defense which shows the money coming back into CM Alternative Energies, and we will not object to them presenting her spreadsheets if they desire to do so, the ones on Wednesday that we provided.

14 RR 19-21; *see id.* at 16.

After hearing the State's proposal, defense counsel indicated that, if the State created a detailed spreadsheet, as proposed, then defense counsel would not need a two-week continuance for further preparation with the assistance of a CPA. *See* 14 RR 24 ("MS. WOOD: Not if they're going to spread it. That will shorten it.").

Immediately thereafter, the trial court made the following ruling:

THE COURT: If they're going to spread it and it's their burden, if they're going to stipulate that $100,000 -- so that's -- we're not going there. So that, I am denying that continued continuance and that request.

51

14 RR 24-25.

Later in the hearing, the trial court explained that the approach proposed by

the State would remedy any harm arising from the alleged *Brady* violation:

> THE COURT: I would like, at the very least, for the chance given --
> you know, for the Defense to be able to cross-examine her [i.e., Sgt.
> Lori Carter, the State's lead investigator] on some of these issues
> regarding the search warrant.
>      I don't -- and so the question is with -- regarding that
> spreadsheet, I think given the State's -- what the State is doing now, I
> think we can remedy – to the extent that that was a failure, I think the
> State's offer right now is a remedy unless the Defense -- I don't know
> if the Defense is seeking any further remedy.

14 RR 26.

Still later, the trial court asked, "Where do we go from here?"  Defense

counsel provided the following response:

> MS. WOOD: Well, it sounds like if they can spread it by Monday, I
> can -- my CPA did say if they would spread it, that would shorten his
> time. I do want to be able to look through it obviously because what I
> was given was incorrect. So to the extent they did work product, it
> was incorrect.

14 RR 28.

Defense counsel requested that the proceedings before the jury be postponed

until the following Tuesday morning, explaining "Monday is when I'm getting

the data and I still need my guy to sit down with me."  14 RR 33.  The trial court

granted that request, instructed the parties to return to court on Monday for matters

52

to be addressed outside the presence of the jury, and ordered court staff to notify the jurors that they were required to return to court on Tuesday morning. 14 RR 33, 35-36.

### d. Monday, August 19

On Monday, August 19, 2013, the parties returned to court for another hearing outside the presence of the jury. During that hearing, the trial court reiterated its ruling on the *Brady* issue. 15 RR 32 ("I've already ruled it's Brady. I understand the State disagrees, but I feel it goes to the intent.").[14]

Defense counsel requested a continuance of one week and also asked for "funding for the accountants." 15 RR 30. Both requests were denied at that time. 15 RR 30. The court explained, "I just -- I think that ultimately where we're getting, I don't think it's going to be in dispute, is that there's going to show that $100,000 went to the defendant and nothing more." 15 RR 30. The lead prosecutor clarified the facts, stating "Your Honor, if I may say, that $100,000 is not just the money that went directly to

---

[14] On Monday, August 19, 2013, the State filed a motion requesting that the trial court issue specific findings of fact in relation to the court's ruling that the State had withheld exculpatory information and thereby committed a Brady violation. 1 CR 230; see id. (asserting, inter alia, "The State vehemently disputes this ruling"). It does not appear that the trial court issued written findings in response to the State's motion.

the defendant but the expenditures that Ms. Timmins allocated as looking like non-grant related expenditures…" 15 RR 30.

Later in the hearing, defense counsel again requested that the trial be recessed for one week. 15 RR 35. The prosecutor responded, "Your Honor … we had planned to get Ms. Timmins here by Wednesday, but if the Court wanted to allow the Defense an additional day, we could still reschedule her flight to be here by Thursday morning, if that's what the Court would prefer." 15 RR 35. The court decided that the trial would resume on the following Wednesday morning. 15 RR 36. The court stated, "I think that will give you time." 15 RR 36.

Before the hearing was recessed, defense counsel renewed their request for funding of an accountant and apprised the court of their newly-reduced need for assistance from that expert. The court agreed to provide the necessary funding for that reduced level of expert assistance:

> MS. WOOD: He doesn't -- if he's not having to spread it, it's more of just making sure that their data is right, and then we need help, I think, showing the jury our version of this.
> THE COURT: For that purpose -- I'm not approving the $10,000 to spread it, but if you need him to sit with you and look at the documents, I will approve that.

15 RR 37.

e. Tuesday, August 20

On Tuesday, August 20, 2013, the trial court held a pretrial hearing in the case of the appellant's co-defendant, Mary-Jo Woodall. Counsel for both parties in the appellant's case participated in that hearing. *See* 16 RR 2.

Later that same morning, the court convened a hearing in the appellant's case and recessed the appellant's trial for six days, until 9:00 a.m. on Monday, August 26, 2013:

> Earlier the Defense had asked for a continuance and I had denied it, but now, in addition to that, the Court has some personal family matters that I must attend to, and so I am going to continue both on the Defense motion and on the Court's own motion, I guess, because it is unavoidable at this point, continue this case until Monday at 9:00 a.m. where we will bring in the jury again.

17 RR 4. The court added, "That should give the Defense plenty of time to go through all the evidence." 17 RR 4.

f. Monday, August 26

On Monday, August 26, 2013, the parties returned to court after the six-day recess. Defense counsel advised the court that the State had notified defense counsel, on August 25, that the spreadsheet prepared by the State's forensic analyst contained some errors.[15] 18 RR 6. Defense counsel requested an addition one-

---

[15]    In his brief, the appellant asserts that "the State's recreated spreadsheets were riddled with errors." App. Brief at 16. The record, however, simply does not support that claim. On the

55

week continuance.  That request was denied.  18 RR 12.  The lead prosecutor

suggested that the court allow the parties to "take a double long lunch - the State

would not be opposed to that - to allow the Defense time to confer with its expert."

18 RR 14.  The court agreed to do so.  18 RR 14.

The direct-examination testimony from Sgt. Lori Carter began during the

Monday morning session and continued after the lunch break.  18 RR 19-67, 75-

contrary, the record supports the conclusion that the errors were relatively insignificant.  On
Monday, August 26, Ms. Taylor, the lead prosecutor, made the following uncontroverted
statements to the court:

> [W]ith regard to the spreadsheet that was provided by our office a week ago, we --
> our analyst rushed over 48 hours to throw this thing together so that the Defense's
> expert could look at it and make sure that he agreed with all the numbers.
> Ms. Timmins looked it over -- and if I were trying to hide evidence, why
> would I let them know that she had found these four problems with it? And they are
> just categorizing errors. It would take five minutes to move these things to a
> different column, and then that's it, the spreadsheet is, to the best of my knowledge,
> accurate beyond that.
> I certainly don't think that it would take any significant amount of time. I
> think certainly within the week their analyst probably has already picked up on
> those things. If they were able to communicate with him, they would probably
> know that.
> In any event, if we were trying to hide information, we certainly wouldn't be
> disclosing to the Defense as soon as Ms. Timmins disclosed to us that she found
> these category errors. I can personally go in and move those to a different column,
> all the numbers would match up, to the best of my knowledge, but in any event,
> they have the services of a professional to let them know if there's a problem.
> And I don't think that this weakens their ability to cross-examine Ms.
> Timmins; in fact, I think all of this would assist them in cross-examining Ms.
> Timmins and certainly allow them to make some kind of case concerning weak
> evidence on the part of the State with regard to its financial evidence, although I
> think that Ms. Timmins would be capable of responding to that, but I certainly
> think that there is plenty of fuel for their cross-examination of Ms. Timmins.

18 RR 8-9.

56

155. Defense counsel's cross-examination of Sgt. Carter commenced well after the lunch recess.  18 RR 156

   g.  Tuesday, August 27

On the morning of Tuesday, August 27, 2013, defense counsel resumed the cross-examination of Robin Timmins, the financial analyst.  19 RR 5.  Later that day, defense counsel conducted further cross-examination of Sgt. Carter, the lead investigator.  19 RR 46.

   3.  The appellant's claim has not been preserved for appellate review

It is well settled that a criminal action may be continued on the written motion of the State or of the defendant, so long as sufficient cause is shown. *See* Tex. Code Crim. Proc. art. 29.03.   A trial court also possesses discretion to grant an oral motion for continuance on equitable grounds.  *See Darty v. State*, 193 S.W.2d 195, 195 (1946); *see also Hernandez v. State*, 492 S.W.2d 466, 467 (Tex. Crim. App. 1973).

However, the denial of an unsworn, oral motion for continuance preserves nothing for appellate review. *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000); *Ricketts v. State*, 89 S.W.3d 312, 317 (Tex. App.—Fort Worth 2003, pet. ref'd); *Woodall v. State*, 77 S.W.3d 388,

401 (Tex. App.—Fort Worth 2002, pet. ref'd); *Seaton v. State*, No. 02-03-0487-CR, 2005 Tex. App. LEXIS 905 (Tex. App.—Fort Worth Feb. 3, 2005).

In the instant case, the appellant has not cited, and undersigned counsel has not found, any written, sworn motion for continuance. This Court should therefore find that the appellant's claim has not been preserved for appellate review.[16]

4. The appellant's claim has not been preserved for appellate review

If this Court reaches the merits of the appellant's claim, the Court should find that the trial court did not abuse its discretion when it declined to grant defense counsel's requests for one or more additional continuances. The applicable standard is well settled:

> Where denial of a continuance has resulted in representation by counsel who was not prepared, we have not hesitated to declare an abuse of discretion. Nevertheless, the granting or denial of a motion for continuance is within the sound discretion of the trial court. To find an abuse of discretion in refusing to grant a motion for continuance, there must be a showing that the defendant was prejudiced by his counsel's inadequate preparation time.

---

[16] The trial court denied more than one of the appellant's requests for continuance. The appellant, however, fails to specify which of those unsuccessful motions is the basis for his claim. To the extent that he complains about the denial of all such motions, his point of error is multifarious and should be overruled on that basis. *See Davis*, 329 S.W.3d 798, 803 (citing Tex. R. App. P. 38.1); *Mays*, 318 S.W.3d 368, (citing *Wood*, 18 S.W.3d 642, 649 n6); *Montemayor*, 55 S.W.3d 78, 82 n.1. To the extent that the appellant complains about the denial of a single motion for continuance, his failure to identify that motion causes his point of error to be inadequately briefed, and it should be rejected on that basis. *See* Tex. R. App. P. 38.1; *Hankins*, 132 S.W.3d 380, 385; *Wyatt*, 23 S.W.3d 18, 23.

58

*Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995) (citations omitted).

In the instant case, "Appellant's counsel contends that the denial of the continuance rendered him unable to prepare an adequate defense; however, he does not argue, must less establish, any specific prejudice to his cause arising from the trial court's failure to continue the trial." *Id*.

Nor does a review of the record reveal any such prejudice. Even if it is assumed, for the sake of argument, that the spreadsheets created by Robin Timmins constituted material, exculpatory evidence, it is clear from the record that copies of the bank records on which the spreadsheets were based were given to defense counsel well in advance of the trial. According to the lead prosecutor, defense counsel received those records in February 2012, roughly 18 months before the trial commenced in August 2013. 14 RR 8.

And even after the allegedly tardy production of those spreadsheets to defense counsel during the trial, the defense attorneys were provided with the assistance of an accountant and were afforded ample time to review and process that information. The spreadsheets were provided to defense counsel on Tuesday, August 13, 2013, pursuant to the trial court's order. 12 RR 236. Due to a series of postponements, including a continuance lasting six days, defense counsel's cross-

59

examination of Sgt. Carter (the lead investigator) was delayed until Monday, August 26, 2013, and continued on the following day. 18 RR 156; 19 RR 46. Defense counsel's cross-examination of Robin Timmins (the financial analyst) before the jury was delayed until Tuesday, August 27, 2013. 19 RR 5. In short, the trial court's refusal to grant the appellant additional time fell within the zone of reasonable disagreement. No prejudice or abuse of discretion has been shown.

Accordingly, the third pointy of error should be overruled.

## THE STATE'S REPLY TO THE FOURTH POINT OF ERROR

THE TRIAL COURT DID NOT ERR WHEN IT DENIED THE APPELLANT'S MOTION TO QUASH THE INDICTMENT ON THE BASIS OF VAGUENESS.

### Argument and Authorities

In his fourth point of error, the appellant complains that the trial court erred when it denied his motion to quash the indictment on grounds of vagueness. *See* App. Brief at 20-26. That point lacks merit and should be overruled.

1. Standard of Review

The sufficiency of an indictment is a question of law. *Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010). An appellate court reviews *de novo* a trial court's ruling on a motion to quash an indictment that is challenged as insufficient. *Id.* at 14.

2. <u>The indictment tracked the statute</u>

The appellant's reindictment for Securing the Execution of a Document by Deception was sufficient to provide him with adequate notice of the charge against him. At minimum, an indictment must "convey sufficient notice to allow the accused to prepare his defense." *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998). "The general rule is that an indictment which tracks the statutory language proscribing conduct as penal is sufficient to charge an offense." *Ex parte Holbrook*, 609 S.W.2d 541, 543 (Tex. Crim. App. 1980).

Here, the indictment tracks the statutory language, setting forth allegations as to the parties and deceptions involved in the execution of the contract. Specifically, Penal Code Section 32.46(a)(1) provides that a person commits the offense of Securing Execution of a Document by Deception if "with intent to defraud or harm any person, he, by deception … causes another to sign or execute any document affecting property or service or the pecuniary interest of any person." Tex. Penal Code § 32.46(a)(1).

Tracking that statutory language, Count I of the reindictment alleged, *inter alia*, as follows:

> [The appellant] … **with the intent to defraud or harm a person**; to wit: the United States Department of Energy and the Comptroller of Public Accounts of the State of Texas, (hereinafter, the Comptroller's Office), did then and there **by deception cause another**, to wit: one or

61

more representatives of the Comptroller's Office, **to sign and execute a document** on or about November 30, 2010, to wit: a Comptroller of Public Accounts Grant Agreement for the Distributed Renewable Energy Technology Program, contract number CS0951, which awarded a grant to the City of Jonestown, Texas, to install multiple wind turbines in and around Jonestown, and Charlie Malouff caused this grant agreement to be signed and executed by the following deceptions: (1) by creating false impressions of fact … and (2) by preventing representatives from the Comptroller's Office from acquiring information likely to affect their judgment in the transaction…
And further the grant **agreement affected the pecuniary interest** of the United States and the State of Texas…

1 CR 6-7 (emphasis added).

Thus, the reindictment's description of the charge is more than sufficient to give the appellant adequate notice of the charge and the opportunity to mount a defense against it.

The appellant argues that, although the language of the indictment tracks the statute, this particular indictment presents an exception to the general rule. Relying on *Haecker v. State*, the appellant asserts that the general rule applies only "when the indictment is framed under a statute in which the act constituting the offense is defined so that the accused is informed of the nature of the charge." Appellant's Brief at 23; *Haecker v. State*, 571 S.W.2d 920, 921 (Tex. Crim. App. 1978).

In *Haecker*, the Court of Criminal Appeals held that when "the language of the statute is not completely descriptive, then merely tracking the statutory language would be insufficient." *Haecker*, 571 S.W.2d at 921. However, *Haecker*'s rule does not apply in the instant case. First, section 32.46(a)(1) is completely descriptive of the offense of Securing the Execution of a Document by Deception. Even the term "deception," which could have different meanings, is defined by direct reference to Texas Penal Code Section 31.01, which identifies certain specific acts that constitute "deception." "When a term is defined in the statutes, it need not be further alleged in the indictment." *Bynum v. State*, 767 S.W.2d 769, 779 (Tex. Crim. App. 1989) (citing *American Plant Food Corp. v. State*, 508 S.W.2d 598 (Tex. Crim. App. 1974)).

Significantly, the appellant's indictment also tracks the language of sections 31.01(1)(a) and 31.01(1)(c), which define deception as either "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true" or "preventing another from acquiring information likely to affect his judgment in the transaction." Tex.

Penal Code § 31.01(1)(a), (c).  Regarding the deception involved in this case, the indictment alleges as follows:

> …Charlie Malouff caused this grant agreement to be signed and executed by the following deceptions:
>
> (1) By **creating false impressions of fact** in the City of Jonestown's grant application and its attachments concerning the qualifications and capabilities of Charlie Malouff's company, CM energies, AKA CM Alternative Energies, Inc. (hereinafter CME), and its wind turbine technology **likely to affect the judgment of representatives of the Comptroller's Office in the grant agreement transaction**, and **that Charlie Malouff did not believe to be true**; and
> (2) By **preventing representatives of the Comptroller's Office from acquiring information likely to affect their judgment in the transaction**, specifically, the fact that the Jonestown grant application and its attachments contained false and misleading information about CME and its wind turbines and the fact that Malouff had a prior and ongoing personal and business relationship with the grant coordinator assigned to this grant.

CR 7 (emphasis added).

Again, the indictment tracks the language of the statute completely. Moreover, the indictment does not *merely* track the language of the statute; it also provides additional factual allegations beyond those set forth in the statute.  The appellant characterizes the indictment as "vague," but Count I clearly sets forth facts that are sufficiently specific to alert the appellant to

the particular transaction at issue and the particular deceptions that he allegedly used to secure the execution of the grant agreement.

Relying upon *State v. Moff*, 154 S.W.3d 599 (Tex. Crim. App. 2004), the appellant argues that his trial was conducted "by ambush" because the evidence needed to provide adequate notice was "buried somewhere in a mass of documents." App. Brief at 26. While *Moff* does prohibit that kind of trial by ambush, that case related to an indictment that charged a defendant with misapplication of fiduciary property in relation to a series of transactions that were made over the course of seven years. The indictment in *Moff* accused the defendant of misapplying money and credit cards "on or about and between January 1, 1993 and December 31, 1999." *Moff*, 154 S.W.3d at 600. Because of that lengthy time frame, the court concluded that it was unreasonable to require the defendant to sift through seven years of bank statements—a veritable "mass of documents"—in order to determine which transactions the State was alleging were criminal.

The appellant's situation differs from that of the defendant in *Moff*. The indictment in the instant case charges the appellant with using deception to secure the execution of *one* document on *one* day. The indictment lists a specific date—November 30, 2010—and refers to the document by name

65

and number. 1 CR 6–7.  Importantly, the appellant has neither alleged nor

established that any other transactions fell within the scope of the allegations

in the reindictment.

Appellant appears to prefer the initial indictment that listed several

facts related to the false impressions that Appellant created with respect to

Appellant's company's capabilities.  Regarding the creation of a false

impression, the original indictment included the following allegations:

> …creating the false impression in the City of Jonestown's grant
> application and its attachments that Malouff's company, CM
> Energies, AKA CM Alternative Energies, Inc., (hereinafter CME) had
> the present ability to install in Jonestown multiple wind turbines
> which (a) were commercially available and readily deployable, (b)
> were capable of generating 20 kW per system, (c) had energy storage
> systems capable of sustaining an emergency service facility as long as
> necessary in the event of a power outage, and (d) the electric
> capability of which had been verified by a licensed master electrician
> with over 24 years' experience; when actually CME's wind turbines
> were still in the research and development phase…

CR 22.  These facts in the first indictment are nothing more than "evidentiary

facts" that are non-essential to an indictment.  *Beck v. State*, 682 S.W.2d 550, 554

(Tex. Crim. App. 1985).  A motion to quash may be granted by a trial court if the

facts sought by the accused "are essential to give notice."  *Bynum*, 767 S.W.2d

at779 (citing *Smith v. State*, 502 S.W.2d 133 (Tex. Crim. App. 1973)).  But the

66

additional facts to which the appellant refers are not essential. The State is not required to "lay out its case in the indictment"; it need only inform the defendant of "the specific transactions that allegedly violate the statute." *Moff*, 154 S.W.3d at 603. The State's reindictment did that and more. The trial court did not err in denying Appellant's motion to quash.

Lastly, even if it is assumed, *arguendo*, that the reindictment is impermissibly vague, the appellant's point of error must still be overruled because he has not established that he has suffered harm as a result of insufficient notice. The central inquiry in a ruling on a motion to quash an indictment is whether the accused has received adequate notice of the charges against him. The accused "suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend." *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003). But Appellant *did* receive notice of the State's theory, if not through the reindictment, then certainly through the initial indictment. If the information that Appellant deems essential is the "'qualifications and capabilities' about which appellant was accused of creating a false impression of fact" and "which 'false and misleading information about CME and its wind turbines' appellant was alleged to have prevented the Comptroller's Office from acquiring," then he received that information in the initial indictment—a fact that the appellant

concedes. App. Brief at 20 ("The original indictment against appellant enumerated specific deceptions which were necessary to show that the offense was committed…"). Additionally, the State provided the appellant, more than a year in advance of trial, with evidence and witness statements establishing which portions of the grant application were alleged to be false—information that the appellant could certainly have utilized to help prepare a defense. 7 RR 12–13.

Accordingly, this Court should find that the trial court did not err when it denied the appellant's motion to quash. The fourth point of error should be overruled.

**THE STATE'S CROSS-POINT OF ERROR**

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT SPREADSHEETS
PREPARED BY THE STATE'S ANALYST WERE REQUIRED, UNDER *BRADY*
AND ITS PROGENY, TO BE GIVEN TO DEFENSE COUNSEL.

Argument and Authorities

Pursuant to Texas Code of Criminal Procedure article 44.01(c), the State

hereby appeals the ruling of the trial court that spreadsheets created the State's

financial analyst, Robin Timmons, constituted material, exculpatory evidence that

the State was obligated to produce to defense counsel pursuant *to Brady v.

Maryland*, 373 U.S. 83 (1963).[17]

1. Introduction

The argument, authorities, and background information set forth above in

the State's reply to the appellant's third point of error are incorporated herein by

this reference. In short, the trial court, on Tuesday, August 13, 2013, ruled that

those spreadsheets constituted material, exculpatory evidence and that the State

was obligated under *Brady* to provide those spreadsheets to defense counsel. *See*

12 RR 236-37. The spreadsheets were provided to defense counsel that same day,

pursuant to the trial court's order. *See* 12 RR 236-40.

---

[17]  "[T]he State need not file its own notice of appeal when it raises a cross-point concerning
a ruling on a question of law under Article 44.01(c)." *Pfeiffer v. State*, 363 S.W.3d 594, 597
(Tex. Crim. App. 2012).

During subsequent proceedings, the court reiterated its conclusion that the spreadsheets constituted material, exculpatory evidence falling within the ambit of *Brady*. *See, e.g.,* 15 RR 32 ("I've already ruled it's Brady. I understand the State disagrees, but I feel it goes to the intent.").

2. Standards relating to disclosure of evidence favorable to the defense

Under *Brady*, the State has an affirmative duty to disclose favorable, material evidence to the defense. *See Brady*, 373 U.S. 83, 87. Favorable evidence is any evidence that, if disclosed and used effectively, may make the difference between conviction and acquittal. *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). Favorable evidence includes both exculpatory and impeachment evidence. *Id*. Exculpatory evidence is that which tends to justify, excuse, or clear the defendant of fault or guilt. *Id.* Impeachment evidence is evidence that is offered to dispute, disparage, deny, or contradict a witness's testimony. *Id*.

Evidence is material, for purposes of the standard *Brady* analysis, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Even in the face of deliberate

70

concealment by the State or its agents, there is no due process violation unless the concealed evidence is material, and when examined as part of the entire record, creates a reasonable doubt concerning the defendant's guilt that would not otherwise exist. *Haygood v. State*, 127 S.W.3d 805, 809 (Tex. App.—San Antonio 2003), citing *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

Thus, under the standard *Brady* analysis, "due process is violated if the prosecutor (1) fails to disclose evidence, (2) favorable to the accused, (3) that creates a probability of a different outcome." *Ex parte Dixon*, 964 S.W.2d 719, 722-23 (Tex. App.—Fort Worth 1998), citing *Bagley*, 473 U.S. 667, 682. "An appellant must meet all three criteria to show that the failure to disclose evidence is so egregious that he has been denied due process and is entitled to a mistrial." *Dixon*, 964 S.W.2d at 723.

But, as the Amarillo Court of Appeals explained in *State v. DeLeon*, 971 S.W.2d 701 (Tex. App.—Amarillo 1998), a slightly different set of standards comes into play if the State fails to disclose *Brady* evidence before trial but then makes a tardy disclosure of that evidence during the trial:

> Under the standard *Brady* analysis, the issue is whether there is a reasonable probability that, had the suppressed evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Thomas*, 841 S.W.2d at 404.

When however, as in the instant case, the State waits until trial to disclose *Brady* material, the inquiry is whether the defendant was prejudiced by the delayed disclosure. *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985); *Yates v. State*, 941 S.W.2d 357, 364 (Tex. App.—Waco 1997, pet. ref'd); *Palmer v. State*, 902 S.W.2d 561, 565 (Tex. App.—Houston [1st Dist.] 1995, no pet.). The disclosure of *Brady* material during trial satisfies the requirements of due process if the defendant received the material in time to put it to effective use. *Yates*, 941 S.W.2d at 364; *Palmer*, 902 S.W.2d at 565; *Givens v. State*, 749 S.W.2d 954, 957 (Tex. App.—Fort Worth 1988, pet. ref'd). In other words, there is no *Brady* violation if the defendant receives the evidence in time to put it to effective use. Likewise, if the defendant actually knows the facts which are withheld, he is not entitled to relief based upon the State's failure to disclose the same facts.

*DeLeon*, 971 S.W.2d at 705-06 .

The Court of Criminal Appeals has adopted this requirement that a defendant prove that he was prejudiced by a tardy disclosure:

To prevail on his *Brady* claim, appellant must show that the State's tardy disclosure prejudiced him. *Little v. State*, 991 S.W.2d 864, 867 (Tex. Crim. App. 1999). To show prejudice, appellant must show a reasonable probability that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different. *Id*. at 866.

*Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999); *see Little*, 991 S.W.2d 864, 866 ("If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been").

3.  <u>The trial court erred when it ruled that the spreadsheets contained or reflected exculpatory evidence</u>

Under *Brady*, the State has an affirmative duty to disclose favorable, material evidence to the defense. *See Brady*, 373 U.S. 83, 87. In the instant case, the spreadsheets were neither favorable nor material. The spreadsheets were not favorable because they had no impeachment value and no exculpatory value in relation to the charged offense of securing the execution of documents by deception. As the prosecutor explained, the appellant was not exculpated by the information in the spreadsheets showing that the bulk of the grant money was spent on the appellant's company:

> [T]he State does not concede that her spreadsheets indicate that the money went where it was supposed to go. The nutshell of the State's case is that lies were contained in the grant application. I believe that all of the State's evidence has pointed to that.
> The State's case is not a theft case and it never was.

13 RR 40.

The offense at issue in the instant case was completed when representatives of the Comptroller's office executed the grant agreement on or about November 30, 2010. *See* 1 CR 6-7 (reindictment); *see also* Tex. Penal Code § 32.46 (Securing Execution of Document by Deception). The flow of the grant funds after that date therefore had no bearing on the issue of whether the appellant secured the execution of the grant agreement by deception.

73

And contrary to the trial court's conclusion, the spreadsheets had no exculpatory value in relation to the issue of the appellant's intent. *See, e.g.,* 15 RR 32 ("I've already ruled it's Brady. I understand the State disagrees, but I feel it goes to the intent."). Here, the State challenged, *inter alia*, the truth of the appellant's representations in the grant application concerning "the qualifications and capabilities of Charlie Malouff's company … and its wind turbine technology." 1 CR 7. Among other things, the State's position was that the grant funds were impermissibly used by the appellant for research and development in his post-application efforts to improve his technology to a level where it truly did live up to his earlier misrepresentations that it was commercially available, readily deployable, and capable of generating 20 kW per system. As Clay Harris, the Controller's former attorney, testified, the grant funds were to be paid out only to reimburse subcontractors for expenditures that had already been made, not for work to be done in the future. 12 RR 43-44, 172.

Thus, under the circumstances of this particular case, the information in the spreadsheets, indicating that the bulk of the grant funds were ultimately funneled back into the company and thereafter used to fund the company's operations, was not *exculpatory* but *inculpatory*. That information supported the proposition that the grant funds were used, not to reimburse the appellant's company for

74

appropriate expenditures, but instead to fund the R&D work performed by the company after those funds were disbursed by the Comptroller's office. In this way, the trial court was incorrect in concluding that the spreadsheets had exculpatory value in relation to the issue of the appellant's intent

4. The trial court erred when it ruled that the spreadsheets were material

Even if it is assumed, *arguendo*, that the spreadsheets had some value as exculpatory evidence, the spreadsheets were not material. Evidence is material, for purposes of the standard *Brady* analysis, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. 667, 682 (1985).

Here, before the trial court ordered the State to provide copies of the spreadsheets to defense counsel, the court was made aware that the spreadsheets were the work product of the District Attorney's Office and that the spreadsheets merely regurgitated information set forth in bank records that had been provided to defense counsel months earlier. *See* 12 RR 233. Indeed, the record reflects that bank records summarized by the spreadsheets had been provided to defense counsel in February 2012, roughly 18 months before the trial commenced in August 2013. 14 RR 8. Because all of the information in the spreadsheets could

75

have been proved by the bank records that they summarized, there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682.

Because the spreadsheets did not constitute *Brady* evidence, defense counsel had no constitutional or statutory basis for obtaining the spreadsheets. In particular, it should be noted that, under article 39.14, "the work product of counsel for the state in the case and their investigators and their notes or report" are expressly excluded from the scope of the discovery authorized by that provision. Tex. Code Crim. Proc. art. 39.14(a). Here, as the lead prosecutor explained, "Ms. Timmins was, at the time, an employee of the State and acting in a capacity effectively as an investigator for our office." 14 RR 8. In addition, article 39.14 provides, "The rights granted to the defendant under this article do not extend to written communications between the state and an agent, representative, or employee of the state." Tex. Code Crim. Proc. art. 39.14(a); *see* 14 RR 8 (where this language was quoted by the prosecutor). Thus, even if Ms. Timmons's status was not that of an "investigator" within the meaning of article 39.14, the spreadsheets that she prepared in connection with the investigation of this case were exempt from discovery under that provision.

76

5. <u>The trial court erred when it ordered the State to provide the spreadsheets to defense counsel</u>

Because the spreadsheets did not constitute material, exculpatory evidence, no violation of due process had occurred as of the time of the trial court's order that copies the spreadsheets be given to defense counsel. The trial court therefore had no valid basis for ordering the State to give copies of the spreadsheets to defense counsel.

6. <u>Conclusion</u>

This Court need not rule on this cross-point of error if the Court overrules all of the appellant's points of error. *See Hargrove v. State*, 774 S.W.2d 771, 772-73 (Tex. App.—Corpus Christi 1989, pet. ref'd). However, if the Court sustains any of the appellant's points of error, the Court should sustain this cross-point.

## **PRAYER**

WHEREFORE, the State requests that the Court overrule all of the

appellant's points of error, sustain the State's cross-point of error if any of the

appellants points are sustained, and affirm the judgment of the trial court.

Respectfully submitted,

Rosemary Lehmberg
District Attorney
Travis County, Texas


*/s/ M. Scott Taliaferro*
M. Scott Taliaferro
Texas Bar No. 00785584
Assistant District Attorney
District Attorney's Office
P.O. Box 1748
Austin, Texas  78767
Phone: 512.854.3626   Fax: 512.854.4810
Email:  scott.taliaferro@traviscountytx.gov
    and AppellateTCDA@traviscountytx.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify, based on the computer program used to generate this brief, that this brief contains 18,471 words, excluding words contained in those parts of the brief that Rule 9.4(i) exempts from inclusion in the word count. I certify, further, that this brief is printed in a conventional, 14-point typeface except for footnotes, any and all of which are printed in a conventional, 12-point typeface.

/s/ M. Scott Taliaferro
M. Scott Taliaferro

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of May, 2015, a copy of the foregoing State's brief was sent, via U.S. mail, email, facsimile, or electronically through the electronic filing manager, to the following attorney for the appellant:

Ariel Payan, Esq.,
1012 Rio Grande
Austin, TX 78701
Fax No. (512) 472-4102
Email: arielpayan@hotmail.com

/s/ M. Scott Taliaferro
M. Scott Taliaferro